FARMERS' LOAN & TRUST CO. v. CAPE FEAR & Y. V. R. CO. et al.

In re MT. AIRY GRANITE CO.

(Circuit Court, W. D. North Carolina. April 3, 1896.)

RAILROAD MORTGAGES—RECEIVERSHIP—PRIORITY OF CLAIMS.

The M. Co. made a contract with the C. Ry. Co. to pay for the construction of a branch from the railway company's line to the M. Co.'s quarries, the amount advanced by the M. Co. to be repaid to it by crediting it with one-half the freight collected on merchandise shipped by it over the branch. The contract was performed substantially as agreed, until the railroad was placed in the hands of a receiver in a suit for the foreclosure of mortgages which were placed on the railroad before the contract was made, and which covered after-acquired property. At this time there was a balance due the M. Co. of over $4,000. *Held*, that neither the corpus of the property in the hands of the receiver, nor the funds in his hands, derived from the operation either of the branch constructed under the contract, or of the other lines of the railroad, were responsible for the payment of this balance to the M. Co. before the payment of the mortgage debt.

Turner, McClure & Rolston, for Farmers' Loan & Trust Co.
Cowan & Cross, Ricaud & Weill, and James E. Boyd, for receiver.
Dillard & King and J. T. Morehead, for Mt. Airy Granite Co.

SIMONTON, Circuit Judge. This case comes up upon the report of Robert M. Douglas, Esq., standing master, and the exceptions thereto. On 28th August, 1889, a contract was made between the Mt. Airy Granite Company, hereafter called the "Granite Company," and the Cape Fear & Yadkin Valley Railroad Company, hereafter called the "Railway Company." Under this contract the granite company covenanted to secure the right of way, grade, bridge, and cross-tie a branch from the railway track to the rock quarry. When that was done, the railway company contracted to iron and operate the branch. If any right of way was desired, the railway company

agreed to have it condemned, and the granite company agreed to pay the damages. The railway company agreed to contract for the work and material necessary for the branch, and have the work done under the supervision of their own engineers, and to draw on the granite company for the amount of the monthly estimates as the work progressed. It was further agreed that the amount so paid by the granite company should be credited to it on the books of the railway company, and when the granite company commenced to ship it would pay in cash one-half of the freight over the railway and the other half of the freight was to be charged against their account with the railway company, until the amount advanced by them was paid in full. This branch was built by the North State Improvement Company at the instance of and under contract with the railway company. The granite company did not pay the monthly estimates. There is no evidence that any monthly estimate was ever rendered to it. Nor did the granite company pay the damages for the right of way. Nothing was paid by the granite company in the course of construction. At the completion of the work the granite company, not being able to pay in cash, gave to the North State Improvement Company, at the request of the railway company, its acceptances for $14,174.86, which was the entire cost of the construction. These acceptances were payable at short dates, and when they became due were renewed from time to time, being reduced in amount by payments of the railway company. The railway company attended to all the renewals. In this way the amount of $8,942.98 was paid by the railway company. These payments by the railway company were made by using one-half the freight received from all shipments by the granite company over the road. Although the contract provided that the granite company should pay the freight on one-half of these shipments in cash, this was never done. The railway company collected the entire freight from the consignees, crediting the granite company with one-half, and charging their construction account with the other half. The acceptances above spoken of were renewed, as has been said, from time to time, until the North State Improvement Company went into the hands of a receiver. At that time there were two of the acceptances in the hands of the Bank of Fayetteville, aggregating $6,579.95, and one in the National Bank of Greensboro for $1,495.58; in all $8,015.53. When the North State Improvement Company went into the hands of a receiver the granite company was compelled to take up these acceptances. On 1st February, 1894, the railway company paid the granite company $500, on 21st February of the same year another sum of $500; which, deducted from the $8,015, leaves $7,015. The master reports that under this contract there is due to the granite company this sum of $7,015.53, with interest from February, 1894.

There were many exceptions taken to the master's report, but at the hearing the only questions raised and discussed were as to the proper amount due to the granite company under this contract, and whether the claim has priority over the mortgage debt. In ascertaining this amount, the first question is as to interest. Was the

granite company entitled to charge interest on the $14,174.86, the cost of construction? It will be observed that the contract says nothing about interest. The total cost of construction was to be paid by the granite company, and it was to be reimbursed by the one-half of the freight charges for the shipments made by it from time to time over the road. Interest, when not a matter of special contract, is allowed in the nature of damages for the detention of money after it is due and payable. U. S. v. North Carolina, 136 U. S. 211, 10 Sup. Ct. 920. In this case the parties agreed that the money should be advanced by the granite company, and repaid by the railway company in a certain way. The evidence shows that up to February, 1894, this was regularly done. Up to this time the cost of construction was paid in the mode in which the contract had provided. Again, the contract provided that the cost of construction should be paid by the granite company in cash. At the conclusion of the work the bill for the entire cost of construction was presented to the granite company. They were unable to pay it in cash. For their accommodation acceptances were taken, and from time to time these acceptances were renewed. The discount on these acceptances so taken for the accommodation of the granite company should be paid by the granite company, otherwise the railway company would not only be made responsible for the interest, which was not within its contract, but would also be called upon to pay for that which was for the accommodation of the granite company. It appears that the last payments were made on this account by the railway company to the granite company in February, 1894, aggregating $1,000. Since that time no payments whatever have been made to the granite company. If the account be therefore stated as of February, 1894, it would result thus:

| | | |
|---|---|---|
| Entire cost of construction | | $14,174 86 |
| Paid up to June 1st, '93, by the railway company | $8,942 98 | |
| Up to February, 1894 | 1,000 00 | |
| | | 9,942 98 |
| Balance | | $ 4,231 88 |

The next question, and, indeed, the controlling question, is, are the funds in the hands of the receiver responsible for this amount, and has it a priority over the mortgage debt? There were two mortgages on the property of the Cape Fear & Yadkin Valley Railway. One—the first mortgage—covered all the main line. The other—the consolidated second mortgage—had a second lien on the main line. The first mortgage had no lien whatever upon the branch lines, of which this granite branch is one. Over this and the other branch lines the consolidated mortgage has the first lien. The funds in the hands of the receiver are derived from the operation of all the lines,—the main line and the branches. The mortgage creditors, having been put into possession, as it were, by an equitable execution in the appointment of a receiver, are entitled to the net proceeds of operation, subject to such claims as the courts have allowed from considerations of equity. Bridge Co. v. Heidelbach, 94 U. S. 800. It is manifest that this claim of the granite company,

arising entirely upon the construction of this branch line only, can have no claim upon either the earnings or the corpus of the other lines, main line, and branches of the railway company. Nor does this claim for construction come within the equities allowed by Fosdick v. Schall, 99 U. S. 235, and the cases following, elucidating, and enlarging this case. Wood v. Safe-Deposit Co., 128 U. S. 421, 9 Sup. Ct. 131. Even were the granite company placed in the position of a contractor who built this branch, it would have no preference over the mortgage. "A mortgage by a railway company of their road, built and to be built, the company at the date of the mortgage having built a part of their road, but not the residue, has precedence, even as regards the unbuilt portion, of a claim of a contractor, who, in the inability of the company to finish the road, had himself finished it under an agreement that he should retain possession of the road, and apply its earnings to the liquidation of the debt due him, and who had never surrendered possession of the road to the company. Dunham v. Railroad Co., 1 Wall. 254. See, also, Commissioners v. Tommey, 115 U. S. 122, 5 Sup. Ct. 626, 1186.

The precise question in this case is settled in Express Co. v. Railroad Co., 99 U. S. 191. "A contract between the Western North Carolina Railroad Company and the Southern Express Company stipulated that the latter should lend the former $20,000, to be expended in repairing and equipping its road, and that in consideration thereof the railroad company would grant the express company the necessary privileges and facilities for the transportation of all the express business over the road, the sum found to be due to the railroad therefor upon monthly settlement of accounts to be applied to the payment of the loan and the interest thereon. The contract was to continue for one year, when, if the money and interest thereon was not paid, it was to continue in force until payment should be made. After the express company had advanced the money and entered upon the performance of its contract, the railroad company conveyed all its property, including its franchises, to a trustee, in trust to secure the payment of certain bonds issued by it. Default having been made in their payment, the trustee brought suit for foreclosure, and obtained a decree placing the road in the hands of a receiver and ordering its sale. The receiver having declined to carry out the contract with the express company, it brought suit for specific performance. Held, that the transaction between the railroad company and the express company is not a license, but simply a contract for transportation, creating no lien, the specific performance whereof would be a form of satisfaction or payment which the receiver cannot be required to make." This is the rubric of the case. The court, in its opinion, after declaring this doctrine, add: "As well might he be decreed to satisfy the appellant's demand by money as by the service sought to be enforced. Both belong to the lienholders, and neither can be thus diverted." It is manifest that the funds in the hands of the receiver cannot be used to pay the intervener. Nor has it a lien or equity superior to that of the mortgage creditor. It is so ordered.