# WOOD *v.* GUARANTEE TRUST AND SAFE DEPOSIT COMPANY.

APPEAL FROM THE CIRCUIT COURT OF THE UNITED STATES FOR THE NORTHERN DISTRICT OF ILLINOIS.

No. 21. Submitted April 25, 1888. — Decided November 19, 1888.

A debt contracted for "construction" is not entitled to the priority of payment, in proceedings for the foreclosure of a mortgage of the property of a railroad corporation, which is recognized in *Fosdick* v. *Schall*, 9

U. S. 235, as the equitable right in some cases of a creditor for "operating expenses."

The doctrine in *Fosdick* v. *Schall* has never yet been applied in any case except that of a railroad, and whether it will be applied to any other case, *quære.*

When a third party with his own money takes up maturing coupons on bonds of a corporation, without knowledge of the holders, it is a question of fact, to be determined by the proof, whether it is intended to be a payment, or a purchase which leaves the coupons outstanding.

The coupons in dispute in this case having been dishonored before they came into the hands of the appellants, were subject in their hands to all defences which existed against their assignor; and, it being evident that, without the knowledge of the holders of the bonds to which those coupons were attached, he used his money to pay the coupons on bonds which had been sold solely in order to enable him to float the rest of the issue; *Held*, that it would be inequitable to allow him, either a preference over those to whom he had sold the bonds, or coequal rights with them.

THE court stated the case as follows:

This is an appeal by interveners in the suit, one branch of which has been disposed of in the preceding case of *Brown* v. *Guarantee Trust and Safe Deposit Company, ante,* 403. In addition to the facts set forth in that case, and which need not be repeated here, it may be stated that on the 23d of May, 1883, an order of the court below was entered, directing the holders of the bonds and coupons issued by the City of Joliet Water Works Company, and secured by mortgage to the appellee in this case, to present them to the clerk of the court, by a certain day, for payment thereon out of the funds then in the hands of that officer.

Pursuant thereto, appellants in this case filed 473 of said coupons held by them, and with them a petition praying that said coupons be decreed to have, in the distribution of said funds, priority of payment as against any of the holders or owners of the said bonds or the subsequently maturing coupons.

The petition alleges, in substance, that for material sold and delivered to Jesse W. Starr, which he used in the construction of his water works system, he was in debt to them $14,000, part payment of which he transferred to them, in October, 1882, these 473 coupons, at par value, amounting to $7095,

and interest from maturity; that the said coupons presented by appellants fell due before the completion of said water works; that upon many of them the amount due at maturity was advanced by Starr to the bondholders, who transferred the same to him; and that the said advance was made out of money which Starr ought to have applied to the payment of his indebtedness for the material so used, and which now constitutes a part of the system of the said water works.

The answer of the appellee contains substantially the statements of the cross-bill set forth in the preceding case. It denies that the coupons presented by appellants had any validity whatever as a lien upon said funds in the custody of the clerk; alleges that all of them were delivered after they were due; and that of the 473 coupons held by appellants, 279 falling due January 1, 1881, and 77 of the 194 falling due July 1, 1881, were detached from the bonds by Starr before they were sold, and before the coupons themselves became due — only 117 being sold with the bonds prior to their maturity. It further alleges that these last coupons were extinguished, cancelled and paid; that the holders of the bonds, who, as requested, presented said coupons for payment at the office of Starr's broker, had no thought of selling them, and, in fact, did not sell them; that all these acts of Starr — cutting off some and taking up others of said coupons — were withheld from the knowledge of said bondholders, were deceptive and fraudulent, were intended to conceal from appellee and the public the fact that the said Water Works Company was insolvent, and, in reality, making default in payment of the interest coupons; and that, as said coupons were delivered by Starr to appellants long after their maturity, they took them subject to all defences which might have been urged against Starr himself.

On May 12th, 1884, the petition of appellants was dismissed at their costs, from which action they have brought this appeal.

*Mr. Charles A. Dupee* and *Mr. Monroe L. Willard* for appellants.

I. *As to the coupons actually cashed by Starr.* These coupons were about 117 in number. At the time Starr paid them he was owing R. D. Wood & Co. about $14,000 for material which they had, during the few months then preceding, furnished him for the construction of his water works system, and which material became a permanent component part of said system. The money which Starr had been and then was raising was raised for the express purpose of defraying the expense of construction of said system. Therefore it was Starr's primary duty to use his money for such purpose, — just as it is the primary duty of railroad companies to apply the earnings of their roads to the payment of current expenses. But the coupons came due before he had finished his construction. If he should allow them to go to default, the whole enterprise would be wrecked. Therefore, honestly supposing, as we believe, that he would soon have his system completed and on a paying basis, he diverted the funds, which he should have used in paying R. D. Wood & Co., to the purpose of taking up the coupons, and thus avoiding a foreclosure — just as, in the hope of averting disastrous foreclosures, railroad companies have at times diverted funds, which should have been used in paying current expenses, to the payment of mortgage interest. The bondholders got not only the material, but the money which should have been applied in payment thereof. We submit that the claim of appellants, who took these coupons in actual part payment of their bill against Starr, comes exactly within the equitable principles laid down in *Fosdick v. Schall,* 99 U. S. 235, and that, without regard to whether the coupons were *transferred* or paid, or were subject to such set-offs as might have existed between the Water Works Company and Starr.

The appellants contend that these coupons were transferred to Starr, and were not so paid as to extinguish their lien. Beasley & Co. suggested to Starr that it would be well for them to pay the coupons. He assented. They informed some of the bondholders that the coupons would be paid at their office in New York. By the mortgage, they were payable in Philadelphia. Beasley & Co. were at no time the company's

agents, but Starr's. The bondholders knew this, or could have learned it by inquiry. The coupons were paid with Starr's money — not the company's. The bondholders knew this, or could have learned it by inquiry. The facts put them on inquiry, but they made none; nor did they cancel the coupons or cause them to be cancelled. Under such circumstances Starr and his assignees for value should be subrogated to all the rights the holders of the coupons had. *Ketchum* v. *Duncan,* 96 U. S. 659.

II. *As to the balance of the coupons,* the appellants have similar equities. It is true the coupons do not stand in the position of having been cashed for the bondholders, but they were delivered to Starr by the company as part consideration for his construction contract, and remained in his possession until delivered by him to appellants in part payment for a portion of the cost of construction. The company never paid a dollar on them. It would be but carrying out the purpose of their delivery to Starr, to allow their payment in favor of the construction creditors who hold them, and who have suffered more from Starr than any of the bondholders, except, perhaps, one.

There is no pretence that these coupons were ever *paid* by anybody. The fact that Starr defaced a large number of them cannot change this.

*Mr. J. L. High* for appellees.

Mr. Justice Lamar, after stating the case, delivered the opinion of the court.

In this appeal the first claim advanced is, that since the 117 coupons, parcel of the lot in controversy, were paid by Starr with the funds that he had raised for the express purpose of defraying the expense of constructing the water works, it was his primary duty so to use the money; and that his failure so to do amounted to a diversion, which will entitle the appellants to a priority, under the doctrine of *Fosdick* v. *Schall,* 99 U. S. 235.

The argument is unsound. There are several answers to it. First, it overlooks the vital distinction between a debt for construction, and one for operating expenses. The doctrine of *Fosdick* v. *Schall* is applicable wholly to the latter class of liabilities. In the case of *Cowdrey* v. *Galveston Railroad*, 93 U. S. 352, it was settled that the doctrine does not apply where it is a question of original construction. Secondly, it overlooks the important fact that the doctrine only applies where there is a diversion of the income of a "going concern" from the purpose to which that income is equitably primarily devoted; viz., the payment of the operating expenses of the concern. In other words, the income must be first devoted to the expenses of producing the income. In this case it is not pretended that the money used in paying the 117 coupons in question was income of the Water Works Company. Thirdly, the doctrine of *Fosdick* v. *Schall* has never yet been applied in any case, except that of a railroad. The case lays great emphasis on the consideration that a railroad is a peculiar property, of a public nature, and discharging a great public work. There is a broad distinction between such a case and that of a purely private concern. We do not undertake to decide the question here, but only point it out. There is other ample ground upon which to decide this question.

It is further insisted, in reference to the 117 coupons, that appellants are entitled to recover on them in their own right, as owners, and independently of the doctrine of *Fosdick* v. *Schall*. These coupons matured July 1, 1881. Appellants came into possession of them in October, 1882 — fifteen months after they were dishonored. If any defence existed against them in Starr's hands, the same defence is available now against Starr's assignee. It is claimed by the appellee that before the appellants acquired them they had been in fact paid. This is denied; and the case of *Ketchum* v. *Duncan*, 96 U. S. 659, is relied on to support the denial.

The facts and the reasoning of the court in that case are as follows: "Duncan, Sherman & Co., who furnished the money which the former owners received for the coupons, did not intend to pay them in any such sense as to relieve the railroad

company from its obligation. By advancing the money, and directing its payment to the holders of the coupons, they intended to take the place of those holders, and to become the owners of the evidences of the company's debt; or, in other words, they intended to obtain for themselves the rights of purchasers. They did not advance the money either to or for the company. Certainly, they did not intend to extinguish the coupons. Of this the evidence is very full. The firm had made advances to the company to pay the coupons due in November, 1873, as well as interest due in January and March, 1874, amounting to a very large sum. These advances had not been repaid when the May coupons fell due. Those coupons the company was then utterly unable to take up. In near prospect of this inability, William B. Duncan, the head of the firm, on the 28th of April, 1874, telegraphed from New York to the company at Mobile that his firm would purchase for their own account sterling coupons, payable in London. The firm also telegraphed to the Bank of Mobile and to the Union Bank of London to purchase the coupons there presented for them, charging their account with the cost, and transmitting the coupons uncancelled. The railroad company acceded to the proposition made them, and the Bank of Mobile and the Union Bank did also. Similar arrangements were made respecting the November coupons, except that Duncan, Sherman & Co. arranged with the Crédit Foncier to make the purchase in London. Both these banks were agents of the firm in the transactions. They were not agents of the railroad company. They had no funds of the company in hand. In taking up the coupons they acted for Duncan, Sherman & Co., charged the cost to their account, transmitted to them the coupons taken up without cancellation, and were repaid by them. In view of these facts it is manifest that, whatever may have been the nature of the transaction by which the coupons passed from the hands of the former holders into the possession of Duncan, Sherman & Co., it was not intended by the firm to be a payment or extinguishment of the company's liability. Neither they, nor the company, nor the Bank of Mobile, nor the Union Bank, nor the Crédit Foncier,

so intended or understood it. Was it, then, a payment? It is as difficult to see how there can be a payment and extinguishment thereby of a debt without any intention to pay it, as it is to see how there can be a sale without an intention to sell.

"But that the coupons were either paid, or transferred to Duncan, Sherman & Co. unpaid, is plain enough. The transaction, whatever it was, must have been a payment, or a transfer by gift or purchase. Was it, then, a purchase? It is undoubtedly true that it is essential to a sale that both parties should consent to it. We may admit, also, that 'where, as in this case, a sale, compared with payment, is prejudicial to the holder's interest, by continuing the burden of the coupons upon the common security, and lessening its value in reference to the principal debt, the intent to sell should be clearly proved.' But the intent to sell, or the assent of the former owner to a sale, need not have been expressly given. It may be inferred from the circumstances of the transaction. It often is. In the present case, the nature of the subject cannot be overlooked. Interest-coupons are instruments of a peculiar character. The title to them passes from hand to hand by mere delivery. A transfer of possession is presumptively a transfer of title. And especially is this true when the transfer is made to one who is not a debtor, to one who is under no obligation to receive them or to pay them. A holder is not warranted to believe that such a person intended to extinguish the coupons when he hands over the sum called for by them and takes them into his possession. It is not in accordance with common experience for one man to pay the debt of another, without receiving any benefit from his act. We cannot close our eyes to things that are of daily occurrence. It is within common knowledge that interest-coupons, alike those that are not due and those that are due, are passed from hand to hand; the receiver paying the amount they call for, without any intention on his part to extinguish them, and without any belief in the other party that they are extinguished by the transaction. In such a case, the holder intends to transfer his title, not to extinguish the debt. In multitudes of cases, cou-

pons are transferred by persons who are not the owners of the bonds from which they have been detached. To hold that in all these cases the coupons are paid and extinguished, and not transferred or assigned, unless there was something more to show an assent of the person parting with the possession that they should remain alive, and be available in the hands of the person to whom they were delivered, would, we think, be inconsistent with the common understanding of business men."

That case clearly settles the proposition that in such a matter as this, the question, as between payment and purchase, is one of fact rather than of law, to be settled by the evidence, largely presumptive, generally, in the case. It is a question of the intention of the parties.

In *Ketchum* v. *Duncan* stress was laid on these circumstances, viz., that the persons alleged to have paid the coupons had no connection with the company issuing the coupons, or interest in it; that they had repeatedly and publicly notified the holders of the bonds and coupons that the coupons were to be purchased, not paid; and that the coupons were carefully received and preserved uncancelled. In the case at bar the conditions are radically different. Starr is essentially (that is, from a business point of view) the Water Works Company, owning, as he does, 19,500 of its 20,000 shares of stock. Its prosperity is manifestly his prosperity, its disaster his disaster, and any disbursement made by it is substantially made by him. There is, therefore, no inherent improbability that he intended to *pay* the coupons, as he indeed instructed his agents, the brokers, that he did. Moreover, such notice as was given to call in the coupons, was notice of payment, not of purchase, so far as the evidence discloses the character at all. Finally, the coupons were cancelled by Starr; all of them being punctured and defaced by mucilage, and about one-half having the word "paid" written across them, in which condition they were received by the appellants. Looking to the testimony, we decline to disturb the finding of the master and of the Circuit Court.

The same consideration of the substantial identity between

Starr and the Water Works Company is of great weight in the determination of the remaining question as to the other 356 coupons. Whatever might be the right of a holder of overdue coupons cut from a bond which is afterwards sold to a *bona fide* purchaser, as between such purchaser and the coupon-holder that question does not arise here.

The case before us is a peculiar one, and must be adjudged on its own facts. As we have already said, Starr was, from a business point of view, substantially the company. Not only was it his object to float the bonds, but to float the company, as well. Hence, when he came to sell these bonds, he arranged with his brokers, Beasley & Co., in reference to the July coupons, (series No. 2). Under that arrangement, such of the coupons as were attached to, and had been sold with, the bonds sold early in the year of 1881, were paid by Beasley & Co., the price was charged to Starr, and the coupons were delivered to him. Such of the coupons as were attached to bonds not themselves sold until the month of June, 1881, were detached from the bonds before sale, and were not charged to Starr, but were delivered to him as property of the company. The coupons of January, 1881, were all detached from the bonds before they were deposited with Beasley.

Now, why all this arrangement and management? To use the language of Mr. Beasley: "It would have been irregular and unbusinesslike to offer for sale or attempt to dispose of the bonds, *not then known in the market,* with overdue coupons attached." In brief, Starr was engaged in floating these bonds. They were not, as the testimony and the history of the case shows, good bonds. He was very careful to prevent anything from transpiring that would injure their credit. He cut off the coupons that were due and unpaid, so long as the bonds remained in his possession, and put up some money to redeem coupons which fell due on bonds that had been sold, so long as he was still engaged in selling other bonds. It looks very much as if Mr. Starr had dug a pit, and was anxiously keeping the pathway to it in good order. It would be inequitable, in our opinion, to allow him to bring forward these coupons as the basis of any preference over, or of even coequal rights with,

those to whom he sold his bonds; and the plaintiff, having taken these coupons when overdue, had no greater rights than he had in this respect. If the courts were to sanction such claims, the commercial securities of the world would be nullified.

*The decree of the Circuit Court is affirmed.*