## MERCANTILE TRUST & DEPOSIT CO. OF BALTIMORE, MD., et al. v. LOW et al.

(Circuit Court of Appeals, Fourth Circuit. May 3, 1898.)

No. 236.

REORGANIZATION OF RAILROAD COMPANY—BONA FIDE PURCHASER OF BOND DEPOSITED.

Railroad bonds were deposited with a security company subject to the order of a reorganization committee. The owners received certificates of deposit therefor, stating the terms of the agreement, which did not prevent the recovery of the bonds by the holder of the certificates, which were made transferable by delivery. Afterwards many of such bondholders approved a plan of reorganization, and signed an agreement giving such committee full and unrestricted control of their bonds. *Held*, that one purchasing such certificates, after the holder thereof had signed such subsc-

quent agreement, and who was aware of the terms thereof, could not recover the bonds represented thereby.

Appeal from the Circuit Court of the United States for the District of Maryland.

E. J. D. Cross, John Phelps, John K. Cowen (Hugh L. Bond, Jr., on brief), for appellants.

John N. Steele (Charles Steele, on brief), for appellees.

Before GOFF, Circuit Judge, and BRAWLEY and PURNELL, District Judges.

GOFF, Circuit Judge. A bill in equity was filed in the circuit court of the United States for the district of Maryland by C. Adolphe Low, George F. Baker, and William E. Strong, citizens and residents of the state of New York, against the Mercantile Trust & Deposit Company of Baltimore, a corporation created by the laws of the state of Maryland, and William H. Blackford, William ·H. Perot, John H. Tompkins, Frank Redwood, Basil B. Gordon, and J. W. Middendorf, citizens and residents of Maryland. The suit grows out of the proceedings instituted in the circuit court of the United States for the Eastern district of North Carolina by the Farmers' Loan & Trust Company of New York, to foreclose a mortgage given to that company, as trustee, by the Cape Fear & Yadkin Valley Railroad Company, a corporation of the state of North Carolina. The mortgage was given to secure an issue of bonds to the amount of $10,000 per mile upon the railroad line and property of said company, as fully described in the said conveyance. The bonds were divided into three series, "A," "B," "C," each series a first lien on separate divisions of the railroad, known as "A," "B," "C," respectively, and a second lien on the other two, subordinate to the series having the first lien on those other divisions, respectively. The railroad company having defaulted in the payment of interest on said bonds, by which the principal of the same became due and payable, the suit to foreclose was filed. The parties to this suit (excepting the Mercantile Trust & Deposit Company) intervened in that proceeding, the appellants as the "Baltimore Committee," and the appellees as the "New York Committee," of the bondholders, the former representing the holders of all series of said bonds, and the latter the series A bondholders. In such foreclosure proceedings, the New York committee insisted that the railroad should be sold in separate divisions, so that each series of bonds might have its own portion thereof as security; while the Baltimore committee claimed that the road should be sold as an entirety, in order to preserve the property as a working unit, and that the proceeds of sale should be apportioned among the various series of bonds, proportionately as their respective values might be ascertained by the court.

In order to perfect a plan of reorganization, an agreement was entered into on the 7th day of April, 1894, by a number of the holders of the first mortgage bonds, by which the appellants were constituted a reorganization committee, representing bonds of all the series, with power to take such measures as they might deem proper

to secure the interests of the bondholders in the reorganization of said railroad company. Such committee was also authorized to prepare a plan of reorganization and to act as a purchasing committee. The bondholders subscribing to said agreement were to deposit their bonds with either of the two depositaries mentioned in the agreement,—the Farmers' Loan & Trust Company of New York and the Mercantile Trust & Deposit Company of Baltimore. Under this agreement a large number of bonds of each series were deposited with the Mercantile Trust & Deposit Company of Baltimore, for which certificates were issued in the usual form. It was set forth in said certificates—which first described the bonds deposited—that the bonds had been placed with said company subject to the terms of the agreement mentioned, and to the order of the committee therein named, or a majority of them, and that the holder assented to the agreement by receiving the certificate. Also it was stated in said certificates that the holder was entitled to receive all the benefits and advantages coming to the depositor under the agreement, and that they were to be transferable by delivery to the purchaser thereof. The plan of reorganization, when prepared, was to be submitted to the bondholders, at a meeting to be called by the committee, of which notice was to be duly given, and copies of the plan sent to such holders, it being provided in the agreement that the plan should be declared adopted, if approved by a majority of each series of bonds.

The Baltimore committee prepared a plan of reorganization, dated October 31, 1895, which was mailed to the various depositors and holders of certificates, and shortly after a notice was sent to each certificate holder, whose address was known to the committee, advising him of the meeting of the bondholders to be held December 23, 1895, for the purpose of considering said plan and adopting or rejecting the same. With the plan and bearing the same date (October 31, 1895) was an agreement, printed in due form, by which the bondholders, or certificate holders, who signed the same, constituted the committee so appointed under the agreement of April 7, 1894, a reorganization committee, for the purpose of perfecting the agreement and plan submitted with it. This agreement provided in what manner persons could become parties thereto; it authorized the issuing of reorganization certificates in exchange for certificates issued under the agreement of April 7, 1894; regulated the terms and negotiability of the same; and set forth that the rights of the transferee thereof should be subject to the conditions of said agreement. The committee so appointed was given full and unrestricted power over the bonds, stock certificates, and securities of the signers of said agreement, and authorized to vote the same at any and all meetings of stockholders, bondholders, or creditors. It was empowered to make such changes as might be deemed proper in the plan of reorganization, and the signers of the agreement were to be bound by such changed or modified plan. With this last-mentioned agreement, which was dated October 31, 1895, the notice mentioned was sent requesting those holding certificates under the agreement of April 7, 1894, to assent to the new agreement by signing the same, provided

the owners approved of the plan. A large number of the bondholders did so assent, and returned the copies of the agreement, duly signed by them, to the secretary of the committee.

Before the Baltimore committee had matured their plan of reorganization, certain holders of the A bonds, who were not satisfied with the then existing situation, entered into an agreement with the appellees, the New York committee, by which certain rights relative to the bonds held by them were given to said committee, and certain duties, not essential to be now set forth, were imposed upon it.

It is quite evident that the New York committee was formed for the express purpose of providing especially for the protection of series A bonds, the intention being to secure for that purpose, if possible, a sale of the railroad by divisions, thereby necessarily opposing the plan of the Baltimore committee. On the 7th of November, 1895, the New York committee caused an advertisement to be inserted in certain of the Baltimore newspapers, in which it was set forth that the plan of reorganization adopted by the Baltimore committee was unsatisfactory; that better terms could be secured for the series A and B bonds; and requesting holders of the same to withhold their approval of the agreement sent them by the Baltimore committee until the situation could be further investigated by the New York committee. On the 12th of November, 1895, that committee published in said papers a further notice, calling attention to the fact that by the agreement of April 7, 1894, it was expressly provided that, when a plan of reorganization had been prepared by the Baltimore committee, a meeting of all the certificate holders should be called for the purpose of taking action upon the same; that no such meeting had been called, but that the Baltimore committee was asking the certificate holders to sign a new agreement, and commit themselves to a plan of reorganization, without having had the opportunity of considering the objections thereto that a meeting of such holders would have afforded. This notice also requested the certificate holders not to sign the agreement presented by the Baltimore committee, dated October 31, 1895, until such meeting should be called and held.

The Baltimore committee called a meeting of the certificate holders, under the agreement of April 7, 1894, for the 23d of December, 1895. Such meeting was duly held, at which the Baltimore committee represented the following bonds: Class A, $366,000; class B, $427.000; class C, $536,000. At this meeting the certificates held by the New York committee were represented and voted against the plan as prepared by the Baltimore committee. The vote cast was as follows: For the plan of the Baltimore committee, A bonds 394, B bonds 497, C bonds 638; for the plan of the New York committee, A bonds 595, B bonds 30, C bonds 15. As the plan of reorganization prepared by the Baltimore committee did not receive a majority vote of the holders of certificates of each class of bonds, as required by the agreement of April 7, 1894, the same was not adopted.

The appellees then made demand of the Mercantile Trust & Deposit Company for the return of the bonds represented by the certificates

held by them, offering at the same time to pay all assessments then due on said bonds, as required by the agreement of April 7, 1894, and claiming that the Baltimore committee had no further authority or duties to perform under that agreement. The trust company delivered to the appellees all of the bonds represented by the certificates held by them, except those whose owners had signed the agreement of October 31, 1895, and which had been acquired by the appellees subsequent to such signing. This suit was then brought to compel the delivery of such last-mentioned bonds to the appellees.

The court below entered a decree by which the Mercantile Trust & Deposit Company was required to surrender to the appellees all the bonds in controversy, provided the appellees returned to said company the certificates representing the same theretofore issued by it. From this decree this appeal is prosecuted.

The bonds in controversy were deposited with the trust company, defendant below, under the agreement of April 7, 1894. The refusal to return them to the certificate holders was based upon the provisions of the agreement of October 31, 1895. As to the ownership of the bonds in suit, or the certificates representing them, there is no dispute, and the controversy is as to which committee has the right to vote and control the same pending the reorganization of the railroad. By the agreement of April 7, 1894, it was provided that if a majority of either class of bonds should disapprove the plan to be submitted, the same should not be adopted, and that the certificate holders should not be bound by it. Under that agreement, on the failure of the plan of reorganization to receive a majority of each series of bonds, there can be no doubt but that it was the duty of the committee to return the bonds on the surrender of the certificates representing them. The question we now have to dispose of depends upon and requires the construction of the agreement of October 31, 1895. Under it, was it the duty of the Baltimore committee to return the bonds, if the plan indicated by the agreement entered into should not be adopted? The provisions of the agreements of April 7, 1894, and October 31, 1895, are not the same, and the latter was evidently drawn to meet conditions not existing when the former was proposed. It is disclosed by the testimony that the New York committee—the appellees—was formed for the purpose of preventing the adoption of the plan referred to in the agreement of April 7, 1894. To accomplish this, certificates, under the agreement by which the Baltimore committee was organized, representing $595,000 of bonds, were purchased by the New York committee, or those representing it. In this connection, it is well to note the fact that the certificates so purchased by the New York committee, now in controversy, were bought in open market, after the holders of the bonds represented by them had signed the agreement of October 31, 1895.

It is apparent that the plan of reorganization as presented with the agreement of October 31, 1895, was prepared with the full realization of the fact, subsequently disclosed, that the method originally contemplated under the agreement of April 7, 1894, would not receive the approval of those holding certificates of series A bonds.

The agreements are quite different, and clearly so, in order to meet the changed conditions in reference to the interests represented by the different bonds. Under the agreement of October 31, 1895, the Baltimore committee was given by those signing it absolute power over the bonds deposited by them,—such power as the owners of the same had prior to such signing. That committee held in the aggregate over $1,500,000 of the bonds referred to in the agreement, and it was authorized to reorganize the road in such manner as to best protect the interests holding the same. It was also authorized to become a party to the foreclosure suit and to other suits, to bid for the railroad and its property, to purchase the same, and to sell any part thereof, to transfer the property to a new corporation, and to apportion the securities of the same among the parties entitled thereto.

The agreement of April 7, 1894, was a valid contract, and bound the parties thereto. The agreement of October 31, 1895, was entirely proper, binding the parties signing it, and as to them changing the terms of the contract of April 7, 1894, in several particulars, not now necessary to be set forth in detail. The agreement of April 6, 1895, by which the appellees were constituted a committee for the purposes mentioned therein, was regularly executed, and bound the parties assenting to it. The owners of the bonds and certificates so assenting had the right to adopt the course therein suggested, if in their opinion their interests would be best protected thereby. The New York committee was constituted under the agreement of April 6, 1895, which authorized those mentioned therein to act for the bondholders who signed the same, and who deposited their bonds as provided for therein. This entitled them, as such committee, to be heard on all matters affecting the bonds so represented by them, and in addition to their said fiduciary capacity, as holders of the certificates issued under the agreement of April 7, 1894,—not affected by the terms of the agreement of October 31, 1895,—the appellees were entitled to be heard by the court below, in their effort to obtain possession of the bonds referred to in said certificates. We therefore find no error in the ruling of the court below that the appellees, as a committee, were entitled to sue for the recovery of the possession of the bonds represented by certificates issued by the defendant below. The contention of the appellants in this particular is without merit.

Those who, after the agreement of April 7, 1894, purchased bonds issued by the Yadkin Valley Railroad Company—especially the appellees—were aware that the same were in default; that a foreclosure suit was pending; that the bonds had been dishonored; and therefore they took such title thereto as the transferror had therein. Parsons v. Jackson, 99 U. S. 434; Wood v. Deposit Co., 128 U. S. 416, 9 Sup. Ct. 131; White v. Railroad Co., 21 How. 575; Daniel, Neg. Inst. §§ 1500, 1502, 1505; Arents v. Com., 18 Grat. 773. In this case, the purchaser of the certificates representing the bonds would take them subject to the terms of the agreements under which such certificates were issued, concerning which it was his duty to be fully advised. The certificates issued under the agreement of April 7, 1894, were to be negotiable and transferable subject to the provi-

sions of that agreement. Those provisions did not prevent the recovery of the bonds described in the certificates, by such holders of the latter as should present them, but the terms of the agreement of October 31, 1895, did prevent it, so far as the bonds were concerned whose owners had signed that contract. The evidence fully discloses the fact that the appellees were aware that many of the holders of certificates issued under the agreement of April 7, 1894, had signed the subsequent contract of October 31, 1895, and also that they were fully advised as to the provisions of that agreement. The agent of the appellees states that he was directed to purchase any bonds concerning which he had not been advised that the owners had assented to the agreement mentioned. It is impossible to escape the conclusion that the appellees, or those representing them, desired to purchase as many of the series A bonds as they could obtain in the market, without their special attention being called to what one of their agents refers to as "legal knowledge" of the fact that the former owners of the same had "assented" to the terms of the contract of October 31, 1895, by subscribing their names to the same. That those who so represented the appellees intentionally refrained from ascertaining if the bonds purchased by them had assented to and were bound by the trust created by the contract of October 31, 1895, is clearly shown by the testimony. If they, in fact, were without the legal information they speak of, the ignorance was willful, and such conduct on their part involves the appellees in the bad faith that results from it, so far as the interests of the appellants in the bonds so purchased are concerned.

The Baltimore committee was lawfully in possession of the bonds in controversy, and the burden was on the parties demanding them to show that they were bona fide purchasers. This, we conclude, in the light of the evidence, the terms of the agreements, and the intention and conduct of the parties, they have failed to do.

We see no error in the action of the court below in overruling appellants' exceptions to the testimony offered by the appellees, and we do not find it necessary to dispose of the other matters suggested by the assignments of error.

The decree appealed from will be reversed, and this cause will be remanded, with instructions to enter a decree permitting the Mercantile Trust & Deposit Company of Baltimore to retain the possession of the bonds of the Cape Fear & Yadkin Valley Railroad Company, now in controversy, described in the certificates issued by said trust company, under the bondholders' agreement of April 7, 1894, numbered 458 to 467, inclusive, and 974 to 978, inclusive; and as to other matters, to dispose of the case as indicated by this opinion. Reversed.