named in the statute or a taxpayer of the county of New York. He had, therefore, no authority to present the petition asking for the revocation of this tax certificate. For this reason the action of the learned justice was correct, and must be sustained, and the order affirmed, with $10 costs and disbursements. All concur.

(29 Misc. Rep. 222.)

ROCHESTER TRUST & SAFE–DEPOSIT CO. v. ROCHESTER & I. R. CO. et al.

(Supreme Court, Special Term, Monroe County.   July, 1899.)

RECEIVERS—IMPROVEMENT OF MORTGAGED PROPERTY— RECEIVER'S CERTIFI-CATES—STREET RAILWAY—LICENSE.

    An electric railway passed under the right of way of a steam railroad, under an agreement that on 60 days' notice it would erect permanent undercrossings of substantial masonry. The electric road having passed into the hands of a receiver, the railroad served the 60-days notice. *Held,* that the permission to cross the right of way being a mere license, which the railroad could revoke at any time, and the railroad not being a party, the court would not authorize the receiver to issue certificates to erect the permanent improvements, but would leave the purchaser at the receiver's sale to assume the responsibility of making them.

Action by the Rochester Trust & Safe-Deposit Company against the Rochester & Irondequoit Railroad Company and another. Motion for authority to issue receiver's certificates. Motion denied.

Charles J. Bissell, for receiver.

W. N. Cogswell, for Rochester Trust & Safe-Deposit Co.

S. D. Bentley, for trustee of second mortgage bondholders.

DAVY, J.   This is a motion by the receiver of the property and franchises of the Rochester & Irondequoit Railroad Company for leave to issue certificates, as such receiver, not to exceed $32,000, bearing interest at the rate of 5 per cent. per annum, which certificates shall be a first lien upon all the property of the Rochester & Irondequoit Railroad Company, both real and personal, and the proceeds of the sale thereof shall be used for the purpose of constructing two permanent bridges or undercrossings in place of the temporary bridges or undercrossings under the railroad tracks of the Rome, Watertown & Ogdensburg Railroad near Windsor Beach, in the town of Irondequoit, as required by the terms and conditions of a certain contract in writing made between the New York Central & Hudson River Railroad Company, as lessee of the Rome, Watertown & Ogdensburg Railroad Company, and the Rochester & Irondequoit Railroad Company, bearing date the 28th day of December, 1893.   The motion is opposed by the Rochester Trust & Safe-Deposit Company, as trustee for the first and second mortgage bondholders of the Rochester & Irondequoit Railroad Company, on the ground that the court has no power to authorize the receiver to issue certificates for the purpose of building said permanent structures.

It appears from the receiver's petition that in the year 1893 the Rochester & Irondequoit Railroad Company constructed a boulevard and double-track railroad, to be operated by electricity by the trolley

system, from Rochester to Summerville. It also appears that the New York Central & Hudson River Railroad Company, at the request of the Rochester & Irondequoit Railroad Company, permitted said company to carry its boulevard and railroad under the tracks of the Rome, Watertown & Ogdensburg Railroad at two places,— one under the Rochester branch, and the other under the main line near Windsor Beach,—upon the express condition that said company should erect and maintain temporary undercrossings at its own risk and expense, and that it would, within 60 days after being requested in writing by the New York Central & Hudson River Railroad Company, construct and maintain permanent undercrossings in place of the temporary ones. The contract also provides that the new abutments are to be of substantial stone masonry, and built subject to the approval of the general superintendent of the last-named company. In pursuance of that agreement the Rochester & Irondequoit Railroad Company constructed its boulevard and railroad tracks under the main and branch lines of the Rome, Watertown & Ogdensburg Railroad Company, and erected temporary undercrossings. The petition also states that the New York Central & Hudson River Railroad Company has, for more than 60 days since, given notice to the Rochester & Irondequoit Railroad Company to construct the permanent undercrossings as required by the terms of said contract, which will, in the opinion of the receiver, cost about $32,000. The petition also states that the Rochester & Irondequoit Railroad Company has no title whatever, or right, to construct its boulevard or lay its tracks under the right of way line of either the main or branch lines of the Rome, Watertown & Ogdensburg Railroad, except such title and right of way as it has by virtue of said contract, and that there is no way by which the cars of the Rochester & Irondequoit Railroad Company can reach Summerville, except by crossing the right of way of the Rome, Watertown & Ogdensburg Railroad Company,—both its main and branch lines,—and, if it were not permitted to cross said company's lands, the value of the whole property would be greatly depreciated, if not destroyed. These are the grounds upon which, in the judgment of the receiver, the necessity exists for issuing receiver's certificates and constructing the permanent undercrossings upon the lands of the New York Central & Hudson River Railroad Company. If the Rochester & Irondequoit Railroad Company is occupying these lands as a mere licensee, I can see no reason, under the contract, why the licensor may not revoke the license at any time, even after the improvements are made. The licensor does not agree that the licensee may have a right of way or easement over its lands if it construct and maintain the permanent undercrossings. The contract is silent upon that point.

The rule is well settled that a license is a mere authority to enter upon the land of another for a certain purpose, and it may be revoked at any time. It has been held in this state that an easement to operate a railroad or to do some act of a permanent nature on the land of another can be created only by deed or conveyance in writing operating as a grant, and that a consent in writing on the

part of the landowner is no more valid than if it were by parol. White v. Railway Co., 139 N. Y. 24, 34 N. E. 887. It may be claimed, however, that if the Rochester & Irondequoit Railroad Company constructs the permanent undercrossings, and maintains them as required by the terms of the contract, it creates an equitable estoppel that will operate to prevent a revocation of the license, on the ground that the licensee has entered upon the land of the licensor and expended thereon labor and money upon the faith of the license. Whether the licensee, after having procured the consent of the licensor to construct its boulevard and railroad upon the land of the licensor upon the condition that the licensee would construct and maintain temporary and permanent undercrossings, has such an interest in the land as will prevent the revocation of the license, is a question which I do not deem it necessary to decide at this time, for the reason that the New York Central & Hudson River Railroad Company is not a party to this action, and could not be bound by any decision that may be made upon this motion affecting its rights and interest in the undercrossings. It has been held that there can be no equitable estoppel which will operate to prevent the revocation of a license, based upon the fact that the licensee has entered upon the land of the licensor and expended thereon labor and money upon the faith of the license, for the reason that the licensee knew that the license gave him no interest in the land, and therefore in the absence of any express agreement to the contrary the license was liable to be revoked at any time.

In White v. Railway Co., 139 N. Y. 25, 34 N. E. 888, Judge Peckham, in speaking for the court, says:

"It is said that a license is a mere authority to enter upon the land, and is a sufficient protection to the licensee while it lasts, but that it may be revoked at any time, and after its revocation it cannot be used as a protection for any future acts. It is held there can be no equitable estoppel which will operate to prevent the revocation of the license, grounded upon the fact that the licensee has entered upon the land of the licensor and expended thereon labor and money upon the faith of the license, because it must be held that the licensee knew that the license gave him no interest in the land, and that he must rely upon the indulgence of the licensor, and, if that be withdrawn, he must himself withdraw from the land; otherwise. it is said, the statute in regard to the creation and conveyance of interests in land would be in great part abrogated."

It is important to understand and bear in mind the distinction between a license and an easement or right of permanent occupancy of the land. Chancellor Kent, in his Commentaries (3 Kent, Comm. 452), says:

"The modern cases distinguish between an easement and a license. A claim for an easement must be founded upon a grant by deed or writing, or upon prescription, which presupposes one; for it is a permanent interest in another's land, with a right at all times to enter and enjoy it. But a license is an authority to do a particular act or series of acts upon another's land, without possessing any estate therein. It is founded in personal confidence, and is not assignable."

The learned commentator adds:

"This distinction between a privilege and an easement, creating an interest in land, and requiring a writing within the statute of frauds to support it, and

a license which may be by parol, is quite subtle, and it becomes difficult, in some of the cases, to discern a substantial difference between them."

The case of Mumford v. Whitney, 15 Wend. 380, contains an able review of many of the conflicting cases. Savage, C. J., cites with approval the case of Cook v. Stearns, 11 Mass. 533. He says:

"Much of the discrepancy may have arisen from the different ideas attached to the word 'license.' If we understand it as Chancellor Kent defines it, it seems to me there can be no difficulty. It is an authority to do a particular act upon another's land. It is founded in personal confidence, and is not assignable."

The learned chief justice then proceeds to illustrate and show what an easement is, or right which can only be acquired by a grant or prescription, as contradistinguished from a mere license. It appears that the marked and leading distinction between them is that in the former there is a permanent interest in the land for some specified period, amounting to an estate in the land, which is assignable and is irrevocable, and gives a right at all times to enter upon and remain in possession during its continuance; while the latter is a mere authority to enter upon the land of another for a temporary purpose, and to do a particular act or series of acts upon the land, and is revocable at pleasure, is not assignable, and gives no estate or interest in the land upon which the act or acts are to be done. It will be seen from the above definition of a 'license' and an 'easement' that the Rochester & Irondequoit Railroad Company has no permanent interest or easement in the land of the New York Central & Hudson River Railroad Company by virtue of said contract, and it must therefore rely upon the verbal consent and indulgence of said company for leave to operate its trolley line over said company's lands.

The power of a court of equity to authorize a receiver to raise money necessary for the preservation and management of the railroad, and make the same chargeable as a lien thereon for its repayment, cannot at this day be seriously disputed. It is a part of that jurisdiction always exercised by a court when necessary to protect and preserve the trust property in its hands. It is undoubtedly a power to be exercised with great caution, and, if possible, with the consent or acquiescence of the parties interested in the fund. Not only will the structures of a railroad deteriorate and decay if not cared for and kept up, but its business and good will will pass away if it is not run and kept in good order. Moreover, a railroad is a matter of public concern. The franchises and rights of the corporation which constructed it were not given merely for private gain for the corporators, but to furnish a public highway. The court, while in charge of the property, has the power to make such repairs as are necessary to keep the road and its structures in a safe and proper condition to serve the public. Many circumstances may exist which may make it necessary and indispensable to the business of the road and the preservation of the property for the receiver to pay pre-existing debts of certain classes out of the earnings of the receivership, or even to issue certificates to pay the same, yet the discretion to do so should be exercised with very

great care. The payment of such debts stands on a different basis from the payment of claims arising under the receivership. The generally recognized rule is that the original construction creditors have no superior equity. I am inclined to think that a court of equity has no power to impair the obligations of a mortgage contract by creating a prior lien, without the mortgagee's consent, unless it be in the exercise of an equitable power to preserve and protect the property, and that it has no power through its receiver to complete unfinished work or to erect new bridges or undercrossings under a pre-existing contract, beyond what is necessary for the preservation of the property of the corporation.

Mr. Beach, in his work on Receivers (section 379), says:

"Within the past twelve or fifteen years these certificates to the amount of many millions of dollars have been issued, and the courts are constantly authorizing the further issue of them, ostensibly for the preservation of the property and in the interest of the bondholders, but, it is believed, in the majority of cases in which they are issued, to the hindrance and delay of a prompt foreclosure, and the impairment of the bondholder's security, and to the scandal of the courts of equity."

Mr. Jones, in his work on Corporate Bonds and Mortgages (section 541), says:

"Complaint as to the management of railroad receivers has generally come, not from stockholders, because it is seldom they care to redeem, but from mortgage bondholders, and as often perhaps from those at whose solicitation the receiver was appointed as from those who may hold under junior mortgages. The history of such management in this country shows that the bondholders chiefly interested have sometimes found themselves improved out of their interest in the property."

And in a note which he appends he adds:

"Judge Baxter is reported to have expressed himself strongly, in a recent case before the circuit court of the United States, against the practice of placing railroads in the hands of receivers. He cites the case of a railroad company in Georgia which cost one million five hundred thousand dollars. The receiver who was in charge of it for three years issued certificates to the value of over one million dollars, and when the road was sold the proceeds were not sufficient to pay the certificates."

In Wood v. Deposit Co., 128 U. S. 416, 9 Sup. Ct. 131, it was held that the doctrine of Fosdick v. Schall, 99 U. S. 235, applied to operating expenses only, and not to a contract in the ordinary construction of the road. The reasoning in the case of Addison v. Lewis, 9 Am. & Eng. R. Cas. 702, is that the claim of contractors for the construction of the road or an extension thereof is simply a general debt, which will not be entitled to priority. In American Loan & Trust Co. v. East & W. R. Co., 46 Fed. 101, the United States circuit court for the Northern district of Alabama held that a debt created for materials for original construction of a portion of a railroad more than six months before the appointment of a receiver in proceedings for the foreclosure of a mortgage is not within the rule authorizing the court to provide arrears due for operating expenses of the road out of the net income of the property. It would not do to charge the income of mortgaged railroad property managed by a receiver, or the property itself, with every debt or contract obliga-

tion incurred in its previous history, even for labor, supplies, or equipment.

In Rhat v. Attrill, 106 N. Y. 423, 13 N. E. 282, Judge Andrews, in speaking for the court, says:

"The lien of the mortgage attaches not only to the land in the condition in which it was at the time of its execution, but as changed or improved by accretions or by labor expended upon it while the mortgage is in existence; and creditors whose debts were created for money, labor, or materials used in the improvements acquire no legal or equitable claim to displace or subordinate the lien of the mortgage for their protection."

The claim of contractors for the construction of the road or an extension is simply a general debt, which will not be preferred to the claim of the bondholders.

It may be said, however, that no fixed and inflexible rule can be laid down for the government of courts in all cases. Each case will necessarily have its own peculiarities, which must to a greater or less extent influence the court when it comes to act. The purpose for which receiver's certificates may be issued is usually confined to making necessary repairs and protecting the property as it is. The propriety of every expenditure is to be judged by the necessity of making it in order to preserve the value of the property in the hands of the receiver. This power, as a general rule, extends only to such expenditures as are necessary for the protection of the property; and the court will not ordinarily authorize expenditures for the completion of structures and improvements unless it is morally certain that the railroad, in consequence of such improvements, will sell for a higher price.

Assuming that the court has power to direct the receiver to issue these certificates for the purpose of making the improvements referred to, the question is whether, under all the circumstances surrounding this case, it would be a proper exercise of judicial discretion to grant this motion. The New York Central & Hudson River Railroad Company is not a party to this action, and would not be bound by any order made herein affecting its rights and interest in said undercrossings. It also appears that the first mortgage upon the Rochester & Irondequoit Railroad Company's corporate franchises is being foreclosed, and the property will soon be sold at public sale to the highest bidder, who will take it subject to the contract in question. I am unable to see how the New York Central & Hudson River Railroad Company can be prejudiced or affected in any way by the foreclosure proceedings, or even prejudiced by waiting until after the foreclosure sale before taking steps to enforce the construction of the permanent undercrossings. It seems to me that it would be better to have the purchaser of this road assume the care and responsibility of making the permanent improvements than to impose that duty upon the receiver.

The motion therefore must be denied.