# Wytheville.

## H. R. CARTER v. W. B. PIERCY AND OTHERS.

June 18, 1931.

Present, Prentis, C. J., and Campbell, Holt, Epes and Gregory, JJ.

The opinion states the case.

*H. Carter Redd* and *Andrew J. Ellis,* for the appellant.

*Allen & Jefferson* and *Wm. M. Smith,* for the appellees.

PRENTIS, C. J., delivered the opinion of the court.

This is an appeal from a decree directing the cancellation and delivery of two negotiable notes held by Carter, which had been endorsed, without recourse, by the administrator of the payee, P. A. Holland. It is shown by the decree and the opinion of the trial judge that the reason for the decree was the holding that the notes had been paid and hence were not liens upon land, as claimed, nor valid as debts of W. B. Piercy and Rebecca Piercy, the drawers.

These notes were two of seven which constituted a part of the consideration due by Piercy to his vendor for the conveyance of a farm in Goochland county which Holland had sold to Piercy for $11,000.00, in December, 1922. Thereafter, November 25, 1927, Piercy entered into a contract in writing,

whereby he agreed to sell the same farm, including the crops, farm implements and stock thereon, excepting household goods, to John H. Garrett, for $14,000.00. The consideration to Piercy was to be paid by Garrett by the assumption of the amounts remaining due and secured by the first deed of trust, for the difference between the $14,000.00 purchase price and the amount of the lien still due and created by the original deed of trust. Of the seven original notes, two of $1,065.00 each had been paid, and $475.00 on account of the third had been paid to Holland, which left at the time of the contract of sale to Garrett $590.00 balance of principal of the note due December 12, 1925, and $1,065.00, the principal of the note due December 12, 1926. The entire balance of principal and interest then due by Piercy to Holland was $5,642.90. Counting the note which was about to fall due—that is, the one due December 12, 1927—Piercy would in a few days owe Holland $3,512.90, which was past due, and also $2,130.00 of principal, evidenced by two notes for $1,065.00 each, not yet due.

The controversy here is between H. R. Carter, claiming to be the holder for value of the two notes which the decree requires him to surrender, and Piercy, who sold the farm to John H. Garrett. Holland's administrator demanded the amount of the balance of two notes, which were overdue at the time of the contract, but agreed to extend the time for the payment of the note about to become due—December 12, 1927.

According to the testimony of John H. Garrett and his brother, Charles E. Garrett, Piercy, before the contract, had been told that Garrett had no cash, and that it would be necessary to have an extension of the overdue portion of the debt due Holland. Holland refused to grant this extension, and, according to Piercy's claim, the whole transaction was to be held up until Garrett had first paid the overdue portion of the debt, the principal of which amounted to $1,665.00; whereas Garrett's claim is that it was distinctly understood that the contract would be executed if he could find someone who would

advance the money upon the overdue notes and take an assignment of them as security for such advancement. Thereafter, Charles E. Garrett, who was representing his brother, the purchaser, approached S. R. Carter, attorney at law, seeking to interest him in the purchase of these notes, which were believed to be well secured by the original deed of trust. S. R. Carter, representing his brother, H. R. Carter, visited and inspected the farm and agreed to supply the necessary funds to purchase the two notes.

These notes, still owned by the estate of P. A. Holland, deceased, were in the possession of the State Bank of Columbia, and Charles E. Garrett, representing John H. Garrett, on December 20, 1927, wrote to the cashier thus:

"We had a little delay in arranging the Piercy matter. If you will attach the two notes we discussed to a draft and draw on us for $2,447.90 through the Broadway National Bank of this city, two days' sight, we will take up the draft. In the meantime, if you will have Mr. Piercy sign the enclosed bill of sale and acknowledge same, which please also attach to draft. You will also be good enough to write us a letter to the effect that upon receipt by you of the proceeds of this draft you will credit the three remaining notes with interest in full to December 12, 1927."

The cashier of the State Bank of Columbia replied under date of December 22, 1927:

"We have your letter of the 20th inst. with reference to the Piercy matter. Mr. Piercy was here today and says that he wanted Mr. John Garrett to come to see him, and that he and Mr. John Garrett would come over to this bank and settle for the Holland notes.

"We are holding the Holland notes for his estate and do not wish to let them pass out of our hands until we receive settlement.

"Mr. Piercy says when you come to bring the deed of trust

signed by Mr. John Garrett and wife and the notes and certified check to take care of the Holland notes.

"Mr. Piercy says tell Mr. John Garrett to come to see him right away."

Mr. Charles E. Garrett replied to this letter of the cashier, under date of December 23, 1927, in which he says this:

"Answering your letter of December 22nd, we are enclosing herein copy of contract with Mr. Piercy. This agreement calls for settlement on January 2, 1928. It provides, as you will note, for the assumption of a first mortgage and for a second mortgage for an amount equal to the difference between the purchase price of $14,000.00 and the first mortgage. It is drawn this way for the reason that Mr. Piercy did not know the amount of the first mortgage. It further provides, as you will note, that the mortgage is to be secured only on the real estate and not on the personal property.

"Mr. Piercy stated there was one note due on December 12, 1927, which he should provide for. It now develops that he has not provided for this and he wants us to pay approximately $2,500.00 in cash when the contract calls for no cash. However, we have agreed to do this and advised him to have the two notes due December 12, 1925, and December 12, 1926, attached to a draft and forward here for payment. This was our understanding the last time Mr. Piercy was here, prior to his visit with you to this office. You mention the fact that you do not care to have pass out of your hands the notes belonging to the Holland estate. We have not asked you or suggested that you turn over these notes before settlement, but simply asked you to attach them to draft on us. They would naturally not be turned over by the bank on whom you drew until draft is paid."

It is unnecessary to reproduce the letter further, except to say that it also directed attention to Garrett's desire to have Mr. Piercy settle as per his written agreement and contract.

Thereafter, December 24th, the cashier wrote to Charles E.

Garrett, in reply to that letter, thus: "I have just seen Mr. Piercy and explained the matter to him as best I could, and I believe he is now ready to settle. However, he is yet very anxious to see Mr. John Garrett to straighten up some things that he doesn't quite understand, and he also wants to see the deed of trust, and has asked me to write you to tell Mr. Garrett to come up the first day next week that he can and to bring the deed of trust, etc., with him and go over it with him. * * *

"If Mr. Garrett should come up to see Mr. Piercy next week and will bring a certified or cashier's check for the first payment we could deliver the Holland notes to him and make the credit of interest on the remaining notes while he is here."

Then, on December 31st, the cashier wrote thus: "As requested in your letter of the 20th, we are drawing on you through the Broadway National Bank, Richmond, Va., a draft for $2,447.90, and as soon as we receive advice that the draft is paid we will credit the three remaining Holland notes with the interest in full to December 12, 1927. Please see that your bank remits the face amount of the draft as we are not authorized by the Holland estate to allow the exchange deducted."

So the draft was drawn by the cashier of the State Bank of Columbia on Garrett & Co. (the trade name of Charles E. Garrett), covering the aggregate face value of the two notes in controversy and the accrued interest on the entire debt. Attached to the draft, in accordance with Charles E. Garrett's instructions, were the two notes, which were not endorsed by the payee, P. A. Holland, or by his administrator c. t. a., R. P. Holland. In the meantime, S. R. Carter had, upon the solicitation of Charles E. Garrett, supplied him temporarily with certain securities upon which Charles E. Garrett (Garrett & Co.) received a credit of $2,500.00 at the Broadway National Bank, the understanding between S. R. Carter and Charles E. Garrett being (though of this Piercy testifies he was ignorant) that the funds would be supplied by his brother, H. R. Carter, who would take an assignment of the two overdue notes for the

$1,750.00 so advanced. No other security was asked for or given.

When the draft, with the past due notes attached, came to Richmond, to the American National Bank of Richmond, Charles E. Garrett, representing his brother, and S. R. Carter, representing his brother, went together to the collecting bank, and the draft was paid by check of Garrett & Co. (Charles E. Garrett) on the Broadway National Bank out of the funds so provided therefor by Carter and the two notes were then delivered to S. R. Carter, pursuant to their agreement.

S. R. Carter, a week later, wrote to the cashier of the State Bank of Columbia that he had not observed the failure of Holland to endorse the notes, and explained the situation from his point of view, requesting that he have the administrator of P. A. Holland endorse the notes "without recourse to me or my decedent's estate." The cashier promptly called the administrator's attention to the request, and he (the administrator) on the next day sent the letter to his attorney, William M. Smith, Esq., and asked that he be advised "whether or not I must comply with their request." Smith replied that he could not perceive that his interest would be prejudiced by making the assignment in accordance with the request, being careful to show that it was made without recourse on the administrator or the decedent's estate.

The principal and interest on the debt being in default, the property, about eighteen months thereafter, in June, 1929, was advertised for sale under the original deed of trust; whereupon Piercy, having been previously notified of the claim that these notes were held by H. R. Carter, instituted this suit, the purpose of which was to restrain the sale and have the notes held by Carter cancelled as having been assumed and already paid by his vendee, John H. Garrett.

There is much testimony in the case which is immaterial, and it is conceded that the only question presented is whether, under the circumstances shown, these two notes should be held to have been paid, or are still unpaid and valid evidences of the debt owned by H. R. Carter by virtue of the assignment to him.

For the appellees it is contended (and this was held by the trial court) that the case is and should be controlled by *Citizens' Bank* v. *Lay,* 80 Va. 436; whereas, for Carter it is contended that the rule enforced in *Cussen* v. *Brandt,* 97 Va. 1, 32 S. E. 791, 75 Am. St. Rep. 762, applies and is decisive of the case here.

There is no doubt whatever, in our view, of the soundness of the rule applied in both of these cases. The differing facts led to different results. The conclusion reached in the *Lay Case* was that the note sent to the First National Bank for collection had been once paid by Pickrell, who had assumed its payment (partly with his own and partly with borrowed money), and, therefore, he (Pickrell) could not thereafter pledge it to the Citizens Bank. In the *Cussen Case,* however, it was held, under the facts shown, that the note had not been paid, but had been lawfully assigned to Elam, who had supplied the funds to pay it at the instance of the payee, and that he (Elam) had the right to collect it. In neither of these cases were the notes attached to a draft sent for collection.

Generally, in such transactions, the question is one of intention—a question of fact to be settled by the testimony. *Wood* v. *Guarantee, etc., Co.,* 128 U. S. 416, 9 S. Ct. 131, 32 L. Ed. 472.

There is a sharp conflict between the testimony of the Garretts and Piercy as to their understanding, but there is no conflict between Piercy, on the one hand, and S. R. Carter and H. R. Carter and the Garretts, on the other, as to the connection of the Carters with the notes. It appears to us that the trial court has failed to observe all the presumptions which are usually so significant in such cases, and has overlooked the strong equity which H. R. Carter has to hold and collect the notes which have been duly assigned to him without notice other than that which the record, the contracts, the deed to Garrett and the circumstances supply.

There is testimony from the cashier of the State

Bank of Columbia, acting as agent for R. P. Holland, administrator c. t. a. of P. A. Holland, deceased, as to his intentions and understanding. This testimony is unconvincing, if not entirely irrelevant. This because Holland, administrator, acting upon the advice of counsel, has himself assigned these notes, at the request of Carter, and so his testimony that he did not understand the legal effect of his act cannot destroy its significance. In addition to this, Holland, administrator, has filed his answer to the bill in this case, in which he states: "This respondent assigned two of the other notes mentioned in the sixth paragraph of the plaintiff's bill, without recourse on him or his decedent's estate, not then or now knowing to whom the notes were assigned, being assigned in blank, and not knowing by whom the consideration was paid." That Holland is estopped, both by his assignment of the notes, as well as by his answer from denying that H. R. Carter supplied the consideration and is the legal holder of these notes by virtue of Holland's endorsement, cannot be questioned by him. That he (Holland) had the right and power to do so is undoubted, and Piercy could not have prevented Holland from exercising that right.

We remark in passing that in our view of this case, even had Holland, administrator, refused to assign these notes, the result would have been the same, because of Code, section 5611, negotiable instruments law. That section provides that: "Where the holder of an instrument payable to his order transfers it for value, without indorsing it, the transfer vests in the transferee such title as the transferrer had therein, and the transferee acquires in addition the right to have the indorsement of the transferrer. But for the purpose of determining whether the transferee is a holder in due course, the negotiation takes effect as of the time when the endorsement is actually made."

No new equity arose between the time of the actual delivery of these notes to Charles E. Garrett and S. R. Carter, either or

both, by the bank, and the time when the actual endorsement by Holland, which this statute requires, was in fact made.

The opinion of the trial court and the entire argument in support of the decree is based upon the assumption that when Charles E. Garrett (Garrett & Co., drawee) paid the draft to which the notes were attached, this was, in its legal consequences, a payment by John H. Garrett of these notes for which he was bound, and that having been so paid they were thereby forever extinguished. The principle relied on is perfectly sound, but it lacks adequate support in the evidence in this case. There is nothing in the testimony which suggests or remotely shows that John H. Garrett, who under the original contract of sale and under his deed only assumed the payment of these notes, has ever paid a dollar upon them, or ever authorized his brother to pay them for him. Based upon the fact that Charles E. Garrett was the agent of his brother in closing the transaction, it seems to be claimed that he was also the agent for his brother to mislead Carter, to take Carter's money, and with it, contrary to their agreement, pay John H. Garrett's debt. True, Charles E. Garrett was agent for his brother, but his powers were not unlimited, and he had been supplied with no funds by his brother. He had never been authorized to pay these notes. It is shown by the uncontradicted testimony, fairly construed, that his authority from John Garrett was to quiet the creditor, Holland, and both of the Garretts knew that one way by which he could be quieted was to induce some other person to provide the money and take an assignment of the notes as security for such lender. It may be true that Piercy was deceived by John H. Garrett, and that perhaps he has some legal or equitable claim against John H. Garrett, other than Garrett's assumption of the debt, but he nowhere testifies to a single fact which would justify the conclusion that he has any legal or equitable claim against Carter, or that Carter has not acted in perfect good faith.

Under persistent examination by counsel, the note-

teller at the American National Bank undertakes to testify as to his understanding of the significance of paying a draft with securities attached thereto. This testimony is not only in itself inconsistent but all inferences therefrom are absolutely destroyed by the testimony of his superior, a vice-president of the American National Bank, a banker of many years' experience, of acknowledged integrity and intelligence, as well as by the testimony of the chairman of the board of the Broadway National Bank, whose reputation is equally as high, as to the significance of such a transaction as this——that is, the collection of a draft with securities attached thereto without more. It is true that if a bank charged with the collection of such a draft has specific instructions as to the securities attached thereto, those instructions must be followed. In the absence of specific instructions, all that the bank which collects such a draft can properly do is to follow the implied instructions, that is, to collect the draft from the drawee, mark it paid and then deliver it to the payee, together with all the securities attached thereto. It is, indeed, a common method of consummating sales of negotiable bonds and stock certificates and transferring title thereto. Of course, the intention controls, but in this case the administrator of the payee of the note is estopped by his acts from denying that he intended to transfer them, and the intention of Carter to buy and hold them as owner is perfectly manifest.

The attaching of these unpaid notes to the draft necessarily implied the delivery of the attached notes to the drawee upon payment of the draft. Had the purpose of the drawer of the draft been merely the collection of the notes, the direct and usual way would have been to send the notes, without any draft, to the collecting bank for collection. The fact that this was not done raises the implication that it was intended to transfer them to another upon payment of the draft. This is a usual and common practice when it is desired to transfer title to securities. In this case this implication is confirmed by

the fact that the administrator of the payee of the notes has actually assigned them. This and the additional fact that he has filed his answer in this case admitting the assignment, supplies all that is necessary to show that he intended all the consequences of his act to follow, and specifically to transfer his title to them. There is nothing in the evidence to destroy the significance of these and the other circumstances. *Hall Building Corp.* v. *Edwards,* 142 Va. 215, 128 S. E. 521.

The equities of Carter, who alone has parted with any value, are superior to the equities of Piercy, who has supplied no consideration, parted with no security whatever in the transaction, and still holds his claim against John H. Garrett and his lien upon the property, both strictly in accordance with the written contract of sale and deed to John H. Garrett.

As has been stated, the entire case for Piercy is built upon the contention that John H. Garrett, the person who had assumed and was therefore obligated to pay the notes ultimately, has paid them, whereas the evidence in the case shows affirmatively that he never paid them. The actual transfer of the funds for the payment of the draft to the collecting bank was made by Charles E. Garrett. Certainly he was under no obligation to pay the notes, and but for Carter's rights, under the evidence in the case, Charles E. Garrett might have demanded their transfer to him under Code, section 5611.

The foundation upon which the decree cancelling these notes rests—that is, that John H. Garrett, being under obligation to pay, has paid them—does not exist, and so the conclusion based upon that assumption is erroneous.

Our conclusion is that so much of the decree as directed the cancellation and delivery of the notes in controversy to W. B. Piercy and Rebecca Piercy is erroneous, and for the reasons we have stated that portion of the decree is reversed, and the cause is remanded for such further proceedings as may be necessary.

*Reversed and remanded.*