MORTON TRUST COMPANY, trustee,

*v.*

THE HOME TELEPHONE COMPANY OF TRENTON,
NEW JERSEY.

[Filed May 2d, 1904.]

1. Where third parties advance money to a corporation to pay interest coupons, which, by the terms of the mortgage securing the coupons and bonds to which they are attached, have preference over the bonds, and receive the coupons in return for their advances in the belief that they succeed to the rights of the bondholders in the coupons by purchase, the bondholders may, nevertheless, insist on their mortgage lien free from the purchased coupons, unless they understood or had reason to inquire, that the third parties were buying the coupons instead of the corporation paying them.

2. Where interest coupons, having preference over the bonds to which they were attached, were turned over to the corporation by which they were issued to be cashed and were canceled as to the bondholders, no subsequent information, either to the bondholders or to purchasers of the bonds from them to the effect that the coupons were sold to third parties instead of being paid by the corporation, would affect the rights of the bondholders or purchasers to hold the bonds discharged from the lien of the coupons.

3. A promise made to coupon-holders to see that the fund arising on foreclosure sale would be sufficient to meet their claims was without consideration, where, if the promise had not been made, the coupon-holders would not have taken any steps beyond securing that result.

4. There was no sale of interest coupons where the holders turned them over to the president of the corporation which issued them, at the company's office, for payment and cancellation, and were not informed by him or anyone that he was purchasing the coupons, and had no reason to suppose that the corporation was not paying them.

5. Where interest coupons are presented to the corporation which issued them, and are taken up, whether the transaction amounts to a payment of the coupons or a sale to a third party who advances the money to take them up, is a question of fact.

On exceptions to a master's report in a foreclosure suit.

*Messrs. Vredenburgh, Wall & Queen,* for the exceptants.

*Mr. Frank S. Katzenbach, Jr.,* contra.

REED, V. C.

A mortgage, dated October 1st, 1896, was executed by the Home Telephone Company upon its property to the State Trust Company, trustee, afterwards merged into the Morton Trust Company, to secure three hundred coupon bonds of the par value of $500 each. The property of the Home Telephone Company was sold *pendente lite* and the proceeds, amounting to $20,000, paid into court:

The question underlying the exceptions to the master's report is whether certain coupons have precedence in payment over the bonds themselves in the distribution of this fund.

The mortgage, in its eighth clause, in substance, provides as follows:

"In case of default in payment, it shall be lawful for the said trustee to sell the mortgaged property and apply the proceeds as follows: *First,* to the payment of the costs and expenses of such sale; *second,* to the payment of the coupons, or interest warrants hereby secured to be paid, and then due and unpaid, *pro rata,* and without discrimination or preference, except that in case such proceeds shall not be sufficient to pay the same, and also the bonds hereby secured to be paid in full, such payment or upon interest coupons shall be in the order of date of their maturity; *third,* to the payment of the bonds."

This language confers upon the coupon-holders the right of payment prior to the payment to the holders of the bonds themselves. The master found that, notwithstanding this clause, certain coupons presented to him, while good in the hands of those presenting them as proof of a debt against the company, were yet subordinated to the lien of other coupons as well as the lien of the bondholders. The coupons thus disallowed had been paid for by money which certain stockholders of the company had advanced for the purpose of saving the credit of the corporation.

The ground upon which the master reached this conclusion was that these coupons were, as to the other coupons and bondholders, to be regarded as canceled. The master put his conclusion upon the well-settled doctrine that if third persons, under an arrangement with a corporation, have advanced money to pay the interest upon bonds and as security for their advance are allowed to take up and retain uncanceled the coupons representing such interest as they are presented by the several bondholders for payment, these coupons will stand as valid securities in the hands of the payers as against the corporation, and the mortgage by which they are secured may be enforced for their benefit; but as between the payers and the bondholders who presented their coupons for payment and received the amount in ignorance of the fact that they were paid by third parties and transferred to them without being canceled, or who supposed them to have been paid, the latter have prior equities; so that if upon foreclosure of the mortgage covering the bonds and coupons the sum realized is not enough to pay the face of the bonds and the matured coupons, the parties so advancing the money to take up the coupons are not entitled to share in the proceeds of the sale. 5 *Thomp. Corp.* § *6116.* The facts are in substance these: The officers of the telephone company discovered that they could not pay the coupons maturing October 1st, 1899, out of the earnings of the company. Mr. Atkinson, a director and some time treasurer of the company, was so informed by Mr. Risdon, the president. Mr. Atkinson suggested to Mr. Risdon that the passing of this payment was not good judgment and would injure the

company, and further suggested that he had friends who would come in and assist in raising money to pay the coupons if Mr. Risdon would help in so doing. Mr. Risdon then said that he would endorse a note for $2,500, the proceeds to be used for this purpose, if Mr. Atkinson and his friends would raise $2,000—$4,500 being required to pay the October maturing coupons. Money was so raised and deposited in the Broad Street National Bank, of Trenton, in which bank the $2,500 note, endorsed by Mr. Risdon, was discounted. Mr. Atkinson became treasurer of the telephone company on December 2d, 1899. The preceding October coupons were still unpaid. He notified the bondholders that they could have their coupons paid by presenting them at the Broad Street National Bank, at Trenton. Most of the bondholders placed their coupons in their local business bank for collection, whence they were forwarded to the Broad Street bank and there cashed. Mr. Atkinson, after the failure to pay the October coupons when they matured, represented to the bondholders that he would endeavor to bring money into the company and rehabilitate it, and procured from most of the bondholders a paper by which they agreed not to take any action against the company before January 1st, 1900.

As already observed, before that time, the amount of $4,500 had been raised, deposited in bank and the bondholders notified to present their coupons to the Broad Street National Bank. It is to be observed that of the $4,500, $2,000 in cash was advanced by Mr. Stillman.

When the coupons, payable on the following April, were about to mature, the company was short $2,500 of the amount sufficient to pay them, and Mr. Atkinson procured $2,500 from William J. Davis.

When the succeeding October coupons were about to mature, he procured an additional $4,500 from Mr. Davis. These maturing coupons were paid at the Broad Street National Bank in the same manner as those of October, 1899, had been paid. This was the last payment of coupons. After the payment of the coupons by the Broad Street National Bank, enough of them were transferred to Mr. Stillman, Mr. Davis and Mr. Risdon, respectively,

to equal the amounts of money advanced by them, namely, $11,880. These gentlemen claim priority of payment for this sum out of the fund in court. The question thus propounded is whether, in respect to the bondholders, the transaction was a purchase of the coupons by Mr. Stillman, Mr. Davis and Mr. Risdon, or whether it was a payment of the coupons by and for the company with money which those gentlemen had advanced. There seems to be no doubt that those who advanced the money to pay for the coupons expected to get the rights of the holders of the coupons. The receipt given by Mr. Atkinson to Mr. Stillman was for money to be used to take up coupons due October 1st, 1899. The money raised by Mr. Atkinson was not deposited to the credit of the company, but to the credit of Mr. Atkinson, as I understand the testimony, and the coupons were received by the bank and charged up to this fund. The solution of the question propounded, however, does not stop with the ascertainment of the intention of those who advanced the money; it involves the further question whether the bondholders understood, or had reason to inquire, whether Mr. Atkinson was buying the coupons. For even if a third person was buying them instead of the company paying them, the bondholders may insist on their mortgage lien free from these purchased coupons. The reason is that it takes two to make a sale and, moreover, the coupon-holders might have preferred to foreclose rather than to sell their coupons. *2 Cook Stock. & Stockh.* § *772.* The gentlemen whose money paid for these coupons place their right to assert a prior lien on the authority of the case of *Ketchum* v. *Duncan, 96 U. S. 659,* decided by a divided court. In that case Duncan, Sherman & Company had advanced money for the purchase of coupons on the bonds of the Mobile and Ohio railroad. The federal supreme court held that they were purchasers, because there were circumstances attending the transfer which should have awakened the attention of holders of the coupons and lead them to inquire as to the true character of the transaction. The circumstances were that the coupons were not paid in the usual manner, or at the usual place, or by the persons accustomed to pay them; they were not paid by check, as they

had been theretofore paid; some of the bondholders knew that the company was not paying the coupons, others were informed that the Bank of Mobile was purchasing them, and others did not know that the company was not paying and made no inquiry. Some of the coupons were paid in London and some in New York City. Those who presented their coupons in New York were told that Duncan, Sherman & Company were purchasing them. There were notices posted in the Bank of Mobile and in the office of the company that the bank was purchasing November coupons. Notice of an intention to purchase was publicly given by the London house of Duncan, Sherman & Company.

Most stress was laid by the court upon the fact that the holders, upon delivery of the coupons, were paid without checks. It was said that the holder, from these facts, must have known that the bank would hold the coupons as a voucher in its settlement with the railroad company. I am unable, however, to appreciate the force of the last inference. If the coupons were cashed, I cannot perceive why the holder would not assume that they were paid out of the money of the company, and so by the company, whether they were paid by cash or otherwise. An arrangement between the bank and the company that the coupons themselves should be accepted as vouchers in the settlement of the bank's account with the company could make no possible difference to the holder, and, as it seems to me, would have no significance whatever for the holder. It is the usual method of collecting coupons. They are deposited in the holder's bank for collection and forwarded to the company's bank and paid upon the delivery of the coupons. The inference arising is that it is charged to the company's bank account. The case of *Ketchum* v. *Duncan, supra,* is the subject of some interesting observations in the opinion delivered in *Wood* v. *Guarantee Trust Co., 128 U. S. 416.*

In the present case I am unable to see how it can be concluded that the coupon-holders were parties to a sale of their coupons. Some of them who were applied to by Mr. Atkinson to assist in raising money were told that he wished to bring new money into the company and to rehabilitate it. Others knew that the

company was in temporary financial embarrassment, by reason of their October coupons remaining unpaid and of their agreement to foreclose before January 1st, 1900. When, however, in December, they received notice to present their coupons to the Broad Street National Bank, no one, so far as appears, knew that the money out of which the coupons were to be paid was not the money of the company, nor whether it had been raised by loan or by sale of stock, or partly derived from the business of the company. No notice was given to these holders that their coupons were being bought. It was not the intention of those who raised the money to disseminate such a notion. They were interested, as stockholders, bondholders and officers, in preserving the credit of the company and the value of their stock and securities. It was not their policy to have it go out that the coupons were not being paid, but were accumulating as a debt, preferable to the bonds themselves. Mr. Atkinson, who gave the notice to the bondholders, was the treasurer of the company. Why, then, should not those notified not have supposed that they were to be paid by the company? Indeed, there is nothing shown which have put the bondholders upon inquiry, except the fact that the coupons were to be paid at the Broad Street National Bank, in Trenton, instead of at the office of the trust company. But this bank was located at the home of the company, and its substitution as a place of payment would seem to be the most natural occurrence, and would seem to have no significance as an indication that the company were not paying the coupons. At this place the October, 1899, coupons were paid, and here the coupons maturing in April and October, 1900, were regularly paid. Most of them, as already remarked, were paid through the agency of the local bank of the bondholders.

In my judgment, there was practically nothing to inform the coupon-holders that they were selling their coupons, and there was everything to indicate to them that their coupons were being cashed by the company itself. But it is further insisted that Mr. Hamill, who has acquired most of the bonds of the telephone company, is precluded from asserting the prior lien of

the bonds over these coupons, because one Redford, from whom he acquired them, had notice of the outstanding claim of the coupon-holders.

It would be profitless to examine in detail the testimony as to the alleged notice possessed by Mr. Hamill, Mr. Redford or any other person interested in the purchase of the bonds. If it should appear that the purchaser of the bonds knew that the coupon-holders claimed precedence in lien, it would not in any way affect the relative right of the parties, for these rights were fixed when the coupons were cashed. If by that act they were canceled as to the bondholders, no subsequent information received by a bondholder or a purchaser would discharge the lien of the bonds. No information received by any person who made subsequent purchases of bonds would affect the *status* of those instruments.

It is also insisted that Mr. Hamill promised to pay the coupons. This promise is asserted to have been made in an interview between Mr. Hamill and Messrs. Davis, Wearts and Stillman, in August, 1901. It is insisted that at that interview Mr. Hamill made an absolute promise to pay the amount of these coupons to the holders thereof.

My examination of the testimony respecting the interview or interviews between Mr. Hamill and these gentlemen leads me to the conclusion that Mr. Hamill, after examining the eighth clause in the mortgage, admitted that by the terms of that clause the coupons had a superior claim to payment over the bonds. He admitted this as a matter of construction of the instrument, and thereafter all the parties at the interviews assumed that they should be first paid, and the question discussed was merely how and when they should be paid. It seems quite apparent that all that took place was based upon the view taken of the legal *status* of the coupons under the terms of the mortgage, and that instead of there being a promise to pay there was simply an assumption by all the parties that the liability rested upon the property mortgaged for the payment of the coupons first. This led to an engagement on the part of Mr. Hamill, in order that the sale of the property might not be

delayed by litigation, to see that enough was paid for it, and paid into court, to cover the claim for these coupons. It is to be observed, however, that in the letter in which this arrangement was put in a written shape Mr. Hamill said that he would bid sufficient to cover these claims, if they were subsequently determined to be good. I fail to find any proof of any absolute promise by Mr. Hamill to pay these claims. It is to be remarked, however, that if Mr. Hamill had personally promised to pay the coupons, the promise would seem to be an entire nullity.

This view does not rest upon the obvious fact that if made it was made under a mistaken view of his legal rights, but rests upon the fact that there seems to have been no consideration to support such a promise. The purpose of Mr. Hamill's arrangement was to assure those gentlemen that the fund arising from the sale of the property would be sufficient to meet their claim as coupon-holders. Now, it does not appear that if the promise had not been made the coupon-holders would have taken any steps beyond securing that result. This result was brought about at the sale, and therefore the holders of the coupons stand in exactly the same posture as though the alleged promise had not been made.

The finding of the master upon this branch of the case is affirmed.

The master allows, as preferred claims upon the fund in court, the amount paid by Mr. Risdon for some coupons in the years 1897 and 1898. The circumstances surrounding the acquisition of these coupons are disclosed entirely by the testimony of Mr. Risdon.

Mr. Risdon was elected president in 1896, and continued in that position down to 1901. In speaking of these coupons, he said: "I cashed these coupons; I do not recall for whom; it is not a matter of record." He says he thinks he held a number of bonds in 1897, but afterwards sold them. He says he does not recall how many coupons he cashed in 1897, but presumes he cashed some in 1897 and in 1898.

He explains as follows: "People would present their coupons there for payment, and the company had not the funds to pay the coupons, so I advanced it myself and retained the coupons."

He was asked:

"Q. I suppose, as the coupons were presented, you paid them, but did not state to them that you were paying these yourself?

"A. That is right; I was under no obligation to pay them personally.

"Q. Did you state to anyone that you were paying them personally?

"A. No, sir.

"Q. Were you interested in keeping up the credit of the company?

"A. Yes, sir."

When Mr. Risdon speaks of the coupons being presented "there," the inference is that they were presented at the office of the telephone company, and were presented to him as the head of the company.

I am unable to conceive how a coupon-holder who presented his coupons to such a person at such a place, and who was paid, with no notification that this president of the company was purchasing them, could remain under any other impression than that the coupons were paid by the company.

The question, as was remarked by Mr. Justice Lamar, in his opinion in *Wood* v. *Guarantee Trust Co., supra,* is always one of fact, whether there was a purchase or a payment. To be a purchase, as already remarked, it requires the consent of the bondholder presenting his coupons. So far as appears there was no consent to a sale from anyone presenting these coupons to Mr. Risdon.

I am compelled to the conclusion that the exception taken to this branch of the master's report must be sustained.