### A. B. & M. LIQUIDATION CORPORATION v. PELHAM HALL CO. et al.

### SAME v. MYLES STANDISH CO. et al.

### Nos. 4505, 4506.

District Court, D. Massachusetts.

July 11, 1939.

As Amended Oct. 6, 1939.

Choate, Hall & Stewart and Richard Wait, all of Boston, Mass., for plaintiff.

Barker, Davison & Shattuck (withdrawn), Robert H. Davison, Haussermann, Davison & Shattuck, and Lewis L. Wadsworth, Jr., all of Boston, Mass., for defendants.

BREWSTER, District Judge.

The purpose of these bills of complaint is to obtain a judicial determination respecting the parity of bonds and coupons held by the plaintiff, and to establish the rights of the plaintiff to participate in the distribution of voting trust certificates, representing shares of common capital stock of the defendant Pelham Hall Co., in No. 4505, and of defendant Myles Standish Co., in No. 4506.

The suits were heard together and will be considered in one opinion.

The American Bond & Mortgage Company, Inc. (hereinafter referred to as the "Mortgage Co."), was a Maine corporation whose principal business was selling securities issued by other corporations, especially bonds secured by real estate mortgage. It also sold its own debentures. On September 5, 1931, it was adjudicated bankrupt in the District Court of the United States for the Northern District of Illinois. Substantially all of the assets of the bankrupt consisted of investments in securities which it had underwritten, or otherwise acquired. Pursuant to an order of the District Court, in which the bankruptcy proceedings were pending, the plaintiff was organized under the laws of Illinois and, in accordance with an offer

of composition which had been confirmed by the Bankruptcy Court, the plaintiff acquired, for purposes of gradual liquidation, certain assets of the bankrupt corporation. Among the securities taken over from the Mortgage Co. were bonds and coupons issued by Pelham Hall, Inc., and by The Myles Standish, Inc., which are the subject matter of this controversy.

## No. 4505.

1. Pelham Hall, Inc., in 1925, authorized an issue of serial bonds aggregating in amount $1,200,000, maturing on semi-annual dates between September 1, 1927, and September 1, 1935.

To secure these bonds, a trust mortgage was executed to the American Trust & Safe Deposit Co., as corporate trustee, and Harold A. Moore as individual trustee, conveying real estate situated in Brookline, Massachusetts.

2. The principal and interest of the bonds were payable at the offices of the Mortgage Co. in Chicago, or New York, or elsewhere as provided in the trust instrument.

Each bond recited that it was one of a series and provided that the "payment of all of which * * * is equally and ratably secured without preference or priority, regardless of maturity, time of delivery or negotiation of any bonds or interest coupon, above or before another of the entire issue, by a deed of trust." The bonds were subject to all the provisions of the trust mortgage. The following provisions are pertinent to the issues of this case: The indenture contained a provision to the effect that the property was conveyed in trust "for the equal and proportionate benefit and security from the date hereof of all present and future holders of said * * * bonds and coupons * * * without preference, priority or distinction as to lien or otherwise of one bond over another bond by reason of priority in time of issuance, negotiation, date of maturity * * * or otherwise * * *."

The mortgagor (hereinafter sometimes referred to as the "grantor") covenanted and agreed not only to pay the principal and interest in accordance with the terms of the bond but also certain Federal and State income taxes, and, as additional security, the grantor agreed to pay to the Mortgage Co. each month a sum equal to one-sixth of the principal of the bond next maturing and interest next to fall due upon all of the bonds secured, as evidenced by coupons. These monthly payments were to be deposited by the Mortgage Co. in designated banks in New York, or in Chicago, in an account separate from its general and other funds, and were to be held for the benefit of bondholders, and payments of principal and interest on bonds were to be drawn upon these deposits which could only be used for the payment of maturing bonds and coupons and payment, or reimbursement, of taxes which the grantor had covenanted to pay. The grantor was also to provide the Mortgage Co. sufficient funds to pay the income taxes required to be paid by the terms of the bond.

There were provisions in the trust instrument to the effect that all bonds or coupons, bought or redeemed by the grantor, or by anyone in its behalf, should not be re-issued but should be forthwith cancelled and thereafter should not participate in the security of the mortgage or deed of trust, provided, however, that the Mortgage Co. might, at its option and in its discretion, without any obligation so to do, purchase any bonds or coupons that have matured, for its individual account or that of anyone else other than the Company.

Section 3 of Article 2 reads as follows:

"If at any time the Company (grantor) or its assigns shall fail to pay any bond or coupon secured hereby as and when the same falls due, then American Bond & Mortgage Co. Inc., or any person, firm or corporation (when not acting for said company) may purchase and hold the same, and such bond or coupon shall not be subordinated to other outstanding bonds and coupons but shall be considered as past due obligations of the company for all purposes."

3. Simultaneously with the issue of these bonds Pelham Hall, Inc., entered into a brokerage agreement with the Mortgage Co. by which the Mortgage Co. was made the exclusive agent and broker of Pelham Hall, Inc., to sell and dispose of the entire issue of First Mortgage Bonds. This agreement also provided for the monthly payments of one-sixth of the principal and interest of the bonds falling due on the next succeeding semi-annual interest payment date, together with income taxes to be paid or reimbursed. It also provided for the deposit of these monthly payments in a separate account and to be

withdrawn only for the payment of interest coupons and the payment of matured bonds. Any interest on these deposits was to be paid to the Mortgage Co. on account of services rendered.

This brokerage agreement contained a provision to the effect that the Mortgage Co. at its election might deduct from the proceeds of the sale of bonds the principal and/or interest that shall have accrued at any time or which shall mature upon said bonds during the first twelve months of construction of Pelham Hall or thereafter, and also deduct the normal income tax payable during said period or thereafter on said interest.

4. Pelham Hall, Inc., had also issued $400,000 principal amount of Second Mortgage Bonds, secured by mortgage to the Liberty Trust Company, as trustee. The bonds and all of the stock of Pelham Hall, Inc., were acquired by the American Mortgage & Loan Co., affiliated with the Mortgage Co., and wholly owned by it or by members of the Moore family. Later, the second mortgage was foreclosed, the real estate purchased by the American Mortgage & Loan Co., which transferred it to a new corporation, the Pelham Hall Corporation. All of the shares of this new corporation, with the exception of three qualifying shares held by directors, were issued to C. C. Moore and still stand in his name on the books of that corporation. Mr. Moore held these shares for the benefit of American Bond & Mortgage Company.

5. Sums sufficient to meet the interest due March 1, 1926, and September 1, 1926, on the First Mortgage Bonds were reserved from the proceeds of the sale of the bonds, and the coupons falling due on those dates were paid by the Mortgage Co. out of the funds thus set aside and were cancelled. The bonds falling due as to principal on September 1, 1927, and March 1, 1928, were extended and expressly subordinated to the balance of the outstanding bonds.

6. Neither Pelham Hall, Inc., nor Pelham Hall Corporation made any of the monthly payments which were to be made to the Mortgage Co. in accordance with the provisions of the mortgage indenture, and no account was opened in any bank or trust company, as provided in said indenture.

7. The Mortgage Co. advanced from its own funds the amount necessary to pay the coupons due March 1, 1927, and September 1, 1927, for which they were subsequently reimbursed by the Pelham Hall Corporation.

8. When the interest coupons due March 1, 1928, September 1, 1928, and March 1, 1929, and serial maturities of bonds due September 1, 1928, and March 1, 1929, became due, the Mortgage Co., upon receipt of such coupons and maturing bonds, distributed to the holders thereof the requisite amount from its own funds and not from any funds supplied to it by the Pelham Hall Corporation or by its predecessor. The Mortgage Co. acquired, before their respective maturities, from the holders thereof $2,400 of bonds, $6,-545.50 of coupons and clipped $451.75 of coupons from the bonds owned by it, and it acquired at and after their respective maturities $28,500 of bonds and $107,258.47 of coupons.

9. It was not until August 22, 1929, that the holders of the First Mortgage Bonds had any notice that the Pelham Hall Corporation or its predecessor had failed to meet the requirements of the mortgage indenture relative to monthly payments, or that the money paid out to bondholders and coupon holders had been furnished by the Mortgage Co. On that date, the Mortgage Co. notified the bondholders that the principal due September 1, 1929, would not be paid, and that the individual trustee would be put in possession of the property on September 1, 1929, and, in the meantime, he would endeavor to work out a plan of reorganization which would best protect the interests of the bondholders. Accordingly, entry was made on August 31, 1929, for the purpose of foreclosing the First Mortgage and on May 6, 1931, the mortgage was foreclosed by sale and purchased by a nominee of a Bondholders' Protective Committee for the sum of $450,-000 and later transferred by this purchaser to the defendant Pelham Hall Co.

10. The foreclosure sale, the organization of the defendant Company, and the transfer to it of the land and building were all pursuant to a plan which had been worked out by a committee for the protection of holders of First Mortgage Bonds, sold through the American Bond & Mortgage Company. This committee requested all holders of bonds to deposit the same with the committee's depositaries, and on April 30 and May 4, 1931, the Mortgage Co. delivered to one of the depositaries $30,900 principal of bonds and $114,255.72 of coupons. Said bonds and coupons were

tendered for deposit pursuant to the terms of a deposit agreement dated October 24, 1929, and the Mortgage Company received from a depositary, the Chicago Title & Trust Company, receipted carbon copies of the form of transmittal letters.

11. In the meantime, a plan of reorganization had been perfected, and under date of April 3, 1931, it was submitted by the Committee to all depositors. The plan provided for the issuance of voting trust certificates representing one share of stock in a new corporation (later organized as the defendant corporation) for each $10 in principal amount of bonds and coupons deposited, excluding coupons payable after March 1, 1931. The Mortgage Co. by depositing its bonds assented to this plan. The secretary of the committee, in April, 1932, notified the depositaries that the voting trust certificates were ready for distribution. The Chicago Title & Trust Company was advised that, pending the determination of the question of the parity of the bonds and coupons deposited by the Mortgage Co., no distribution would be made to it. In a subsequent circular letter, however, addressed by it to all depositors, it was represented that the amount of the outstanding bonds at the time of foreclosure was $1,172,000, upon which was due as of that date $1,487,339.29. These amounts included the bonds and coupons deposited by the Mortgage Co. Later, these securities were returned by the Chicago Title & Trust Company to the trustee in bankruptcy of the Mortgage Co. and were acquired by the plaintiff as a result of the acquisition of the assets of the bankrupt.

12. No voting trust certificates have been issued to the Mortgage Co. or the plaintiff on account of said bonds and coupons. The voting trustees and the defendant Boston Safe Deposit & Trust Company, their agent for the issuance of voting trust certificates, have refused to issue such certificates and warrants to the plaintiff in exchange for said bonds and coupons which it now holds. The plaintiff has made due tender of the bonds and coupons and has made demand for the issue to it of voting trust certificates in accordance with the terms of the plan of reorganization. Since the issuance of such voting trust certificates, dividends have been paid thereon to the holders thereof in the aggregate amount of $1.05 a share.

## No. 4506.

1. Myles Standish, Inc., in 1925, authorized an issue of serial bonds aggregating in amount $1,450,000, maturing on semi-annual dates between June 1, 1927, and June 1, 1935. To secure these bonds, a trust mortgage was executed to the American Trust & Safe Deposit Company as corporate trustee and Harold A. Moore as individual trustee, conveying certain real estate situated in Boston, Massachusetts.

2. The principal and interest of the bonds were payable at the office of the Mortgage Co. in Chicago or New York, or elsewhere, as provided in the trust instrument, and were subject to the provisions of the trust mortgage. The provisions of the bonds and mortgage were identical with those set forth in paragraph 2 under No. 4505.

3. Simultaneously with the issue of these bonds, Myles Standish, Inc., entered into a brokerage agreement with provisions similar to those referred to in paragraph 3 under No. 4505.

4. The interest due December 1, 1925, and June 1, 1926, on these bonds was reserved from the proceeds of the sale of the bonds and coupons falling due on those dates, were paid by the Mortgage Co. out of the funds thus set aside and were cancelled. The coupons due December 1, 1926, were paid by the Mortgage Co. with funds supplied by Myles Standish, Inc., and these coupons were cancelled. The interest coupons due June 1, 1927, December 1, 1927, June 1, 1928, and December 1, 1928, were paid by the Mortgage Co. from its own funds, and not from any funds supplied to it by Myles Standish, Inc. The serial maturities of bonds due June 1, 1927, December 1, 1927, and June 1, 1928, were paid by the Mortgage Co. out of its own funds, and not from any funds supplied to it by Myles Standish, Inc. At and after their respective stated maturities, and before the date of foreclosure, hereinafter referred to, the Mortgage Co. acquired $40,000 of bonds, $2,000 of which were received in exchange for other securities. It also acquired $149,902.02 of coupons, at and after their respective dates, and clipped $2,453.75 of coupons from bonds owned by it. Before the respective stated maturities, and before the date of said foreclosure, the Mortgage Co. acquired $21,900 in bonds, of which $10,400 were of stated

maturities subsequent to the date of foreclosure, and $11,500 of which were of stated maturities prior to the foreclosure. It also acquired $18,651.75 of coupons before their respective due dates.

The Mortgage Co. also made certain advances to Myles Standish, Inc., for the payment of Federal and State taxes upon the bonds and coupons in the sum of $3,843.15. The Mortgage Co. further made a claim for interest on bonds and coupons in the amount of $13,602.54 and interest on advances for taxes amounting to $223.97, making a total of amounts paid out for bonds, coupons, taxes, with interest thereon, of $250,577.18.

5. No account, as provided in Section 1 of Article 2 of the trust mortgage, was opened by the Mortgage Co. in any bank or trust company for the payment of maturing bonds and coupons and the payment or reimbursement of taxes.

6. On November 30, 1928, Harold A. Moore, as individual trustee under the Indenture, entered and took possession of the mortgaged premises for the benefit of the holders of the bonds.

On April 22, 1929, the individual trustee declared the entire amount of outstanding bonds due and payable, and on May 15, 1929, the mortgaged premises were sold at public auction in foreclosure of the mortgage. It was not until May 18, 1929, that the holders of the Myles Standish bonds had first notice that the bonds were in default. The mortgaged premises were purchased by Harold A. Moore, as individual trustee, in behalf of all the bondholders, for a price of $1,622,391.31, this sum being $1,432,000, the aggregate principal amount of bonds, including both those acquired by the Mortgage Co., as stated above, and those held by other parties, together with coupons and interest on matured bonds and past due coupons in the sum of $185,868.45, plus an item of $4,522.86 on account of taxes, which also included the taxes advanced by the Mortgage Co. in the sum of $3,843.15, as stated above. Thereafter, on August 29, 1931, Boston Safe Deposit & Trust Co. succeeded Moore as trustee under the Indenture.

7. The Mortgage Co. deposited with American Safe Deposit & Trust Company, trustee under said Indenture of Trust, the said bonds and coupons and its claim for said advances for the payment of taxes in the sum of $3,843.15 and received in exchange therefor, and for interest on the same to May 15, 1929, in the sum of $13,-826.51, a total of $250,577.18, the certificates of deposit of the American Trust and Safe Deposit Company, the corporate trustee, and the receipts of Harold A. Moore, individual trustee, all dated November 27, 1929. The receipts given by the individual trustee contained an acknowledgment that the Mortgage Co. was the owner of the interest coupons and bonds which had been deposited, and which were referred to specifically in said receipts, and stated that the Mortgage Co. was entitled to the proportion which the rights, privileges and obligations set forth in said deed of trust in connection with the ownership of said bonds and coupons bears to $1,622,391.31, being the total amount of indebtedness secured by the First Mortgage at the time of foreclosure sale. These certificates of deposit and receipts have been acquired and are now held and owned by A. B. & M. Liquidation Corporation as the result of its acquisition of the assets of the Mortgage Co. under the said decree of the United States District Court for the Northern District of Illinois, dated July 20, 1934.

8. In pursuance of a Plan of Reorganization, dated February 1, 1935, and under the authority of a decree of the Probate Court of the County of Suffolk and Commonwealth of Massachusetts entered on March 27, 1935, the properties covered by said Indenture were conveyed by Boston Safe Deposit and Trust Company to defendant Myles Standish Company in consideration of the issuance by Myles Standish Company of its entire capital stock to voting trustees under a certain agreement of trust established pursuant to the provisions of said Plan of Reorganization.

9. Said Plan of Reorganization provided for the issuance of voting trust certificates representing the capital stock of Myles Standish Company to the holders of the bonds and certificates of deposit and receipts therefor in the proportion of one share of stock for each $100 principal amount of bonds. It also provided for the issuance of voting trust certificates to A. B. & M. Liquidation Corporation in the event that it should be determined that A. B. & M. Liquidation Corporation was entitled to participate in the benefits of the Plan.

10. There have been issued, or held ready for issue, to all bondholders other than A. B. & M. Liquidation Corporation, upon surrender of and in exchange for their bonds or certificates of deposit and receipts therefor, voting trust certificates in accordance with the Plan. The voting

trustees and defendant Boston Safe Deposit and Trust Company, as their agent for the issue of certificates of deposit, and defendant Myles Standish Company have refused to issue voting trust certificates to plaintiff on account of and in exchange for the certificates of deposit and receipts which plaintiff holds. Since the issuance of said voting trust certificates, dividends have been paid thereon to the holders thereof in the amount of $3 per share.

Plaintiff has made due tender of the certificates of deposit and receipts which it now holds and has made demand for the issue to it of voting trust certificates in accordance with the terms of the Plan of Reorganization.

### Nos. 4505 and 4506.

The following facts are common to both cases:

1. In 1925, the Mortgage Co. undertook to finance the construction of apartment buildings in Boston and Brookline by the sale of First Mortgage Bonds. At the time the venture was undertaken, neither building had been constructed, and the money necessary for their construction was to come from proceeds of the bonds in question which were to be sold by the Mortgage Co. under the brokerage agreement. The obligor in each instance was the company which was to own and operate the building when constructed. They were separate corporations, and the money with which to discharge the obligations must necessarily have come from the operation of the properties after they were completed. Until the buildings were erected and tenants had been obtained, there could be no source of income from which to pay either the interest or the principal. It was to provide for the first two installments of accrued interest that the brokerage agreement provided for the reservation, out of the proceeds of the sale of bonds, of funds sufficient to meet these installments.

2. Coupons paid out of the funds of the Mortgage Co. were paid in the usual manner at offices of the Company as they were presented. Some came from the banks where they had been deposited for collection. Others were presented by the holders at the offices of the Company. The Mortgage Company paid the 2 per cent. federal tax due on the coupons and refunded to coupon holders the amount of state income taxes due, whether funds for this purpose had been advanced by the mortgagor or not.

3. The course of dealing with the bonds paid by the Mortgage Co. out of its own funds was this:

When the bond was presented for payment, the Mortgage Co. gave to the customer a "re-sale authority" or a "customer re-sale order." If the bonds were presented by a bank, acting for the owner or transmitted by mail, the "authority" or "order" was sent to the party presenting or transmitting the bond, who may or may not have been the owner. Some of these re-sale orders were signed by customers and copies retained by the Mortgage Co., but so many of them had been lost or destroyed that it was not possible to determine how many were signed by the actual owner of the bond. Without awaiting a re-sale the Mortgage Co. paid the amount of the bond, and no separate account was set up with the customer presenting the bond, or coupon, except as a matter of statistical record.

4. No notice was given to bondholders presenting these bonds and coupons that the makers of the bonds had failed to pay the monthly installments required by the trust mortgage to be paid to the Mortgage Co. No bondholder presenting bonds or coupons was advised that the coupons on the matured bonds were being satisfied from funds supplied by the Mortgage Co. Except as to a relatively insignificant amount, all coupons were paid on or after the due date, or within thirty days prior thereto.

Holders of coupons testified that when they presented them for payment or deposited them in their bank for collection, they had no knowledge that the coupons were not being paid out of funds provided by the mortgagors. These cases may be deemed to be typical.

5. The same findings may be made respecting the acquisition of the matured bonds, except whatever effect may be given to the re-sale authority or orders issued at the time of payment as above noted. There can be no doubt that the practice of the Mortgage Co. was consistent with the exercise of its rights to purchase bonds and coupons that had matured, and I find that its intention was to exercise this right of purchase. But I find that this intention was never communicated to, or shared by, the bondholder presenting his bonds and coupons for payment. Obviously, the Mortgage Co. was not advertising the fact that these bonds were in default. Its business was selling such real estate bonds. It

had sold the issues involved in these cases, and it was selling its own debentures.

6. Many of the bondholders, whose matured bonds and coupons were paid, held other bonds of later maturity and were holders of bonds at the time of the foreclosure which participated in the Plan of Reorganization.

7. The defendants Frederick G. Curry and Walter J. Sugden are the voting trustees under the Pelham Hall reorganization, and defendants Frederick G. Curry, Walter J. Sugden and George H. Wilkins are the voting trustees under the Myles Standish reorganization, and, in both cases, the defendant Boston Safe Deposit & Trust Company is the agent for the voting trustees for the issuance of certificates of deposit.

The issue presented is whether the plaintiff, as holder of bonds issued by Pelham Hall, Inc., and Myles Standish, Inc., together with interest coupons thereon, may participate in the reorganization plans and receive its share of voting trust certificates.

It appears, in the case of each reorganization, that when voting trust certificates were distributed the right of the plaintiff to participate was left open for future determination.

· The plaintiff's contention is that the bonds and coupons were purchased pursuant to the provisions of the trust mortgage, which has been set out in full in paragraph 2 of the findings in No. 4505, and that the parity of the bonds and coupons has been recognized by the trustee for bondholders and by the depositaries in both cases.

.The defendants, on the other hand, deny that there was a purchase and for a further defense argue that the plaintiff, as successor to the Mortgage Co., is estopped to now claim that the bonds and coupons were purchased rather than extinguished and that its course of dealings constituted a fraud upon the other bondholders by concealing what should have been disclosed.

█ It has been remarked in several cases that the question whether the coupons are extinguished by payment, or survive as a secured obligation, depends upon the particular facts of each case. Wood v. Guarantee Trust & Safe Deposit Co., 128 U.S. 416, 9 S.Ct. 131, 32 L.Ed. 472. It is not easy, therefore, to find a general rule to be applied to the transactions here involv-

ed. The leading cases in the Supreme Court dealing with this problem are Ketchum v. Duncan, 96 U.S. 659, 24 L.Ed. 868, and Wood v. Guarantee Trust & Safe Deposit Co., supra.

In the Ketchum case, it was made apparent that the intention of the one furnishing the money was deemed an important factor. The Court made this observation:

"It is as difficult to see how there can be a payment and extinguishment thereby of a debt without any intention to pay it as it is to see how there can be a sale without an intention to sell." [96 U.S. 662, 24 L. Ed. 868.]

The Court nevertheless recognized the necessity of mutuality of intention, saying:

"It is undoubtedly true that it is essential to a sale that both parties should consent to it. We may admit, also, that 'where, as in this case, a sale, compared with payment, is prejudicial to the holder's interest, by continuing the burden of the coupons upon the common security, and lessening its value in reference to the principal debt, the intent to sell should be clearly proved.' But the intent to sell, or the assent of the former owner to a sale, need not have been expressly given. It may be inferred from the circumstances of the transaction. It often is."

It was further noted that coupons were instruments of peculiar character, passing by delivery, creating a presumption of transfer and especially was this true when the transfer was made to one who was not the debtor and to one who was under no obligation to pay them. In that case an implied assent to a sale was found in the facts that the coupons were not paid in the usual manner or at the usual place or by the person accustomed to pay them.

In Wood v. Guaranty Trust & Safe Deposit Company, supra [9 S.Ct. 134, 32 L.Ed. 472], the Court held that the payment of the coupons extinguished them. In that case, the coupons were paid at the usual time and place by one whom the Court said was "from a business point of view, substantially" the corporation issuing the bonds.

So far as they relate to the coupons, the facts of the cases at bar which are favorable to the defendants' contention are that the coupons were paid at the place where they were to be paid and by the party who was to pay them and were paid at approximately the time when they

should have been paid; that they were paid without notice to the holder or person presenting them; that thay were being purchased; that the Mortgage Co. was selling these bonds and, therefore, had an interest in concealing the failure of the mortgagor to meet its obligations, and that the holders presenting the coupons intended to present them for payment and supposed they were being paid. There was also the fact that the Mortgage Co. paid or refunded income taxes on the coupons.

These facts standing alone would undoubtedly warrant the conclusion that the coupons were paid and thereby extinguished. There are other undisputed facts, however, which the plaintiff contends lead to a quite different conclusion. While I confess that the question is not entirely free from doubt, I am of the opinion that the plaintiff's contention should prevail on the law and equities of the cases. In the first place, the bonds were designated and sold as "Construction bonds". The proceeds from them, so far as the bondholders knew and so far as appears in evidence, were the only funds available for construction. Anyone buying these bonds was chargeable with knowledge of these facts and of the consequences that reasonably might have been anticipated. Among these probable consequences was the prospect that the obligor would not be able to meet early interest charges or early installments on principal, whatever the ultimate success of the venture might be. It was to provide for this contingency that the provisions were inserted in the trust mortgages giving to the Mortgage Co. the privilege of purchasing overdue bonds and coupons and holding them as outstanding obligations secured by the mortgages. These provisions were set forth in paragraph 2 of the statement of facts, and each bond was subject to them. These provisions being incorporated in the trust mortgages leave no room for the defendants to argue that the exercise of the privilege thereby conferred was a fraud upon the. holders of the bonds or worked an estoppel.

Undoubtedly the Mortgage Co. had an interest in concealing the failure of the mortgagor. It was equally to the advantage of the bondholders to avoid an early foreclosure before the project had been put on a paying basis. I have no doubt that the Mortgage Co., in financing these defaults, relied upon these provisions of the trust mortgages and believed it was incurring no risk in so doing.

Any construction put upon this provision of the trust mortgages relative to financing defaults which did not permit the Mortgage Co. to take up the coupons whenever it elected to do so, without notice to holders, would render the provisions meaningless. It is not to be assumed that the parties intended these provisions to be mere surplusage.

■ Neither the law nor the terms of trust agreement imposed any duty upon the Mortgage Co. to notify bondholders that the mortgagors were in default. Anderson v. Pennsylvania Hotel Co., 5 Cir., 56 F.2d 980.

■ Nor did the terms of the trust mortgages impose any duty upon the Mortgage Co. to pay out of its own fund. There is no doubt that it did so, and many of the holders who received the money participated in the plan of reorganizing. It would seem inequitable to now deny to the plaintiff the right to participate in the proceeds of the foreclosure sales, especially in the case of the Myles Standish, where the property sold for enough to cover all secured claims including the claim of the Mortgage Co. There are further facts which, standing alone, might not be controlling but which, when added, lend support to the plaintiff's case. The bonds and coupons were deposited under depositary agreements, and the right of the Mortgage Co. to participate in the proceeds of the sale under the mortgage was recognized not only by the depositaries but by the trustees.

Each case cited by the defendants, in support of their contention that the coupons are extinguished, has some point of distinction. Thus, in Ferree v. New York Security & Trust Co., 8 Cir., 74 F. 769, the payments were made by a guarantor under contractual relation with holder to see that the note was paid, giving rise to a presumption of payment. In Venner v. Farmers' Loan & Trust Co. of New York, 6 Cir., 90 F. 348, there were facts, not present in the instant cases, which tainted the claim with fraud. In none of these cases was there any provision of the trust instrument for financing a default, such as are found in the mortgages securing the bonds in question. In the First Trust Co. of Lincoln, Neb., v. Ricketts, 8 Cir., 75 F. 2d 309, the Court notes in its opinion the absence of any such provision.

All that I have said above relative to coupons is equally applicable to the matur-

358

ed bonds acquired by the Mortgage Co. The additional fact that the Mortgage Co., in each case, took a re-sale order from the customer, clearly indicating an intention to purchase, is significant. These orders were notice to the customers of this intention. It is objected that the notice was not given until the bonds were received by the Mortgage Co. The bonds were not registered bonds, and it is difficult to see how the intentions of the Mortgage Co. could have been communicated to the holder until the bonds were presented for payment. In some instances the re-sale orders were signed by the holders themselves, and in others they were mailed to the party forwarding the bond. In the latter case, notice to the agent would be notice to the bondholder.

While I have concluded that under the particular circumstances of these cases no actual notice of election to purchase was necessary, if, however, we assume for present purposes that a notice was necessary, such notice was given; and there can be no doubt that the bonds, whether acquired before, at, or after maturity, were purchased and were outstanding obligations secured by the mortgages and entitled to participate in the reorganizations.

I have reached the conclusion, in view of the foregoing, that the plaintiff is entitled to prevail in these suits and that it should receive the voting trust certificates to which it would be entitled as holder of bonds and coupons of both Pelham Hall, Inc., and The Myles Standish, Inc.

As to the extent of plaintiff's relief, in No. 4505 plaintiff is entitled to receive voting trust certificates representing 14,515 shares of stock in the defendant Pelham Hall Company together with the dividends to which said shares are entitled, with interest thereon. In No. 4506 the committee for bondholders treated the Mortgage Co. as holder of bonds and coupons aggregating $250,577.18. It appears that in this sum was included an item of $13,826.51, being interest on overdue coupons and sums advanced for taxes by the Mortgage Co. While apparently the committee was questioning only the parity of certain coupons, I am unable to see any justification for allowing interest on unpaid coupons held by the Mortgage Co. unless the same privilege is accorded other bondholders. As I read the plan of reorganization, the rights of bondholders to participate in the voting trust certificates were measured solely by face value of the bonds and coupons deposited under the plan.

Therefore, in No. 4506, the plaintiff is entitled to receive voting trust certificates representing 2,367 shares of stock of the defendant Myles Standish Co. together with dividends to which said shares are entitled, with interest thereon.

Decrees may be entered consistent with the foregoing.