498

PELHAM HALL CO. et al. v. A. B. & M. LIQUIDATION CORPORATION.

MYLES STANDISH CO. et al. v. SAME.

Nos. 3542, 3543.

Circuit Court of Appeals, First Circuit.
June 7, 1940.

Robert H. Davison, of Boston, Mass. (Lewis L. Wadsworth, Jr., and Haussermann, Davison & Shattuck, all of Boston, Mass., on the brief), for appellants.

Richard Wait, of Boston, Mass. (Charles O. Pengra, Charles P. Curtis, Jr., and John Dane, Jr., all of Boston, Mass., and Cassels, Potter & Bentley, of Chicago, Ill., on the brief), for appellee.

Before MAGRUDER and MAHONEY, Circuit Judges, and PETERS, District Judge.

PETERS, District Judge.

The question raised by these suits in equity, commenced under the old practice, is whether certain bonds and coupons, under the circumstances disclosed, should be treated as outstanding secured obligations of the issuing corporation in a reorganization plan, they having been paid and taken up at maturity by another corporation having no obligation to do so. Both cases, in which the facts are substantially the same, were heard together in the District Court, and were decided below in one opinion.

The District Court decided that the transactions were in effect a sale and purchase of the bonds and coupons and for that reason they should be regarded as outstanding and on a parity with unmatured bonds and coupons of the same issue. From this decision the defendants appealed, claiming that the transaction represented a payment and that it cannot be treated as a sale and purchase.

In the Pelham Hall case, the securities referred to were part of a first mortgage bond issue of $1,200,000 issued by Pelham Hall, Inc., which financed the construction of an apartment house with proceeds from the sale of bonds which were floated by the American Bond & Mortgage Company, Inc. The trust mortgage securing the issue of $1,200,000, dated September 1, 1925, ran to a wholly-owned subsidiary of the American Bond & Mortgage Company, Inc., and to an individual, treasurer of the Mortgage Company, as trustees.

Shortly after the first mortgage was given, a second mortgage was authorized securing an issue of $400,000. This was foreclosed in 1927 and the property, subject to the first mortgage, was sold to an affiliate of the Mortgage Company, title being later transferred to a new corporation, called Pelham Hall Corporation, and all the shares of this corporation, with the exception of the qualifying shares of directors, were issued to one C. C. Moore who held the shares for the benefit of the Mortgage Company.

At the time of the issue of the first mortgage bonds Pelham Hall, Inc., entered into a brokerage agreement with the Mortgage Company by which the Mortgage Company was made the exclusive agent to dispose of the entire issue. The agreement also provided for monthly payments to be made the Mortgage Company, each equal to one-sixth of the amount of principal and interest of the bonds falling due on the next succeeding semi-annual interest payment date, together with income taxes. These sums were to be used by the Mortgage Company to meet the semi-annual payments when due.

The mortgagor having no income until the building was erected and tenants could be secured, there was an agreement that the Mortgage Company should deduct from the proceeds of the bonds and retain in its possession sufficient funds to finance the payments due in 1926.

Bonds falling due in 1927 and on March 1, 1928, were extended, and coupons falling due up to March 1, 1928, were paid on presentation for payment at the offices of the Mortgage Company, where they were payable.

When the coupons due March 1, 1928, to March 1, 1929, inclusive, and the bonds due September 1, 1928, and March 1, 1929, became due, and were presented for payment, the owners received payment, but not from any funds supplied by the mortgagor or its successor, neither being able to raise any money for the purpose. The Mortgage Company, at whose offices all bonds and coupons were payable, furnished the necessary money for the payment and took up the bonds and coupons as they were presented. It is claimed that this action was taken under a clause in the mortgage indenture which read as follows:

"If at any time the Company (grantor) or its assigns shall fail to pay any bond or coupon secured hereby, as and when the same falls due, then American Bond & Mortgage Company, Inc., or any person, firm or corporation (when not acting for the said Company) may purchase and hold the same, and such bond or coupon shall not be subordinated to other outstanding bonds and coupons but shall be considered as past due obligations of the Company for all purposes."

Thereafter, the Mortgage Company and, after its bankruptcy, its successor, the plaintiff, appellee herein, asserted ownership of the bonds and coupons so taken up and the right to use them in the reorganization as other first mortgage obligations were used.

The owners of the bonds and coupons presented for payment were not aware that they were paid from funds supplied by the Mortgage Company and had received no notice that the monthly installments, required by the trust mortgage to be paid in to the Mortgage Company to take up maturing bonds and coupons, had not been paid. It does not appear that the owners had any intention of selling their bonds or coupons and they were not apprised of any intention on the part of the Mortgage Company to purchase them. It was obviously to the advantage of the Mortgage Company not to disclose the true situation as it was dealing in these very bonds and also selling its own debentures. On the other hand many of the bondholders, whose matured bonds and coupons had been paid, as they supposed, were holders of later maturities of the same issue which obviously would be strengthened in security by part payment of the whole issue, and correspondingly weakened by a default.

In addition to paying the coupons as they were presented the Mortgage Company paid the 2 per cent federal tax on them and refunded to the holders the amount of the state income tax.

The procedure as to the bonds differed somewhat from that in the case of the coupons in that when a bond was presented for payment the Mortgage Company gave or sent to the customer a so-called "re-sale authority" for signature. If the bonds were presented by a bank acting for the owner, or transmitted by mail, the "authority" was sent to the party presenting or transmitting the bond, who may or may not have been the owner. Some of the re-sale orders were signed by customers and copies retained by the Mortgage Company, but many were lost or destroyed, and the District Court found that it was not pos-

sible to determine how many were signed by the actual owner of the bonds. Without awaiting a re-sale the Mortgage Company paid the amount of the bond and no separate account was set up with the customer presenting the bond except as a matter of statistical record.

The defendants contend that where the holders of the bonds and coupons simply presented them for payment and had no notice from the Mortgage Company that it intended to purchase, or to exercise any option to purchase, or was furnishing the money; and where the bonds and coupons were sent to the place where they were payable, on or about the time when due, and paid in the customary manner without any disclosure as to the source of the funds, the transaction appeared to be a payment and should be so regarded in spite of the undisclosed intention of the paying agent to purchase for itself.

This makes it necessary to consider the status of the bonds and coupons in the hands of the Mortgage Company,—or in the hands of its successor with no greater rights.

Referring now particularly to the coupons: The District Court found that it was the intention of the Mortgage Company to exercise the right of purchase reserved to it in the indenture, but that "this intention was never communicated to, or shared by, the bondholder presenting his bonds and coupons for payment". [28 F. Supp. 350, 355.]

In such a situation the transaction can hardly be held to be a sale, unless an intention to sell can be implied from the circumstances; at least not without something occurring or something being done by the party furnishing the money to give notice of his intention to treat the transaction as a sale and purchase.

In the case of Ketchum v. Duncan, 96 U.S. 659, at page 662, 24 L.Ed. 868, relied upon to some extent by both parties and cited by the district judge, the court said:

"It is undoubtedly true that it is essential to a sale that both parties should consent to it. We may admit, also, that 'where, as in this case, a sale, compared with payment, is prejudicial to the holder's interest, by continuing the burden of the coupons upon the common security, and lessening its value in reference to the principal debt, the intent to sell should be clearly proved.' But the intent to sell, or the assent of the former owner to a sale, need not have been expressly given. It may be inferred from the circumstances of the transaction."

The court further said, 96 U.S. at page 663, 24 L.Ed. 868:

"In the present case, there was much in the circumstances attending the transfer of the possession of the coupons from the original holders to Duncan, Sherman, & Co., or their agents, tending to show that those holders could not have believed the payment made to them extinguished the securities, so that they could not thereafter be set up by the transferees against the railroad company. Those circumstances, certainly, should have awakened their attention and led them to inquiry. The coupons were not paid in the usual manner, or at the usual place, or by the persons accustomed to pay them. * * * Some of them knew the company was not paying those coupons. Others inquired, and were told the bank would purchase. * * * At the bank, the holders received the amounts due on the coupons, and left them in the possession of the bank: but, as they brought no checks, they must have known that the bank had no vouchers for its payments, unless the coupons continued in force in the hands of the new possessors; and hence it is a fair presumption, that, when they delivered the possession, they assented to a transfer of ownership. They must have expected that the bank would hold the coupons as claims against the railroad company; and with that expectation they transferred them to the bank. What was that but tacit consent to a sale? * * * Here, too, it is a reasonable presumption, that both parties supposed and expected that the coupons remaining uncancelled would be preserved, and held as claims against the railroad company. * * * There were, however, notices that the Bank of Mobile was purchasing them posted in the bank, and in the office of the railroad company. In London, they were taken by the Crédit Foncier, with which Duncan, Sherman, & Co. had arranged to purchase them; and notice of an intention to purchase was publicly given by the London house."

The payment of the coupons in the Duncan case was held not to extinguish them because the circumstances of that case warranted the presumption "that both parties supposed and expected that the coupons remaining uncancelled would be preserved,

and held as claims against the railroad company". The circumstances here are quite different. The District Court found that the coupons were "paid at the place where they were to be paid and by the party who was to pay them and were paid at approximately the time when they should have been paid; that they were paid without notice to the holder or person presenting them; that they were being purchased".

No notice was given to the holders of the securities of any purpose on the part of the Mortgage Company to purchase, and nothing occurred which "should have awakened their attention and led them to inquire". Every appearance of purchase was avoided. The natural belief from all the circumstances that the coupons were being paid and not purchased was also encouraged by the fact that the Mortgage Company paid the necessary state and federal income taxes, which are only payable when interest is being paid and not when interest coupons are bought and sold.

It is clear that there were no circumstances from which an intention on the part of the coupon holders to make a sale could be inferred or which would put them on inquiry as to the intention of the Mortgage Company to purchase, and that, independently of any provision in the mortgage indenture, there is no warrant for the conclusion that the coupons were purchased and not paid. Martin v. Bank & Trust Co., 94 Tenn. 176, 28 S.W. 1097; Morton Trust Co. v. Home Telephone Co., 66 N.J.Eq. 106, 57 A. 1020; Baker v. Meloy, 95 Md. 1, 51 A. 893; Ferree v. New York Security & Trust Co., 8 Cir., 74 F. 769; Venner v. Farmers' Loan & Trust Co., 6 Cir., 90 F. 348.

The district judge considered that the provision in the mortgage, above quoted, authorizing the Mortgage Company to purchase bonds and coupons, if not paid when due by the mortgagor, permitted the Mortgage Company to take up such coupons and hold them unsubordinated whenever it elected to do so, without notice to holders.

We are unable to agree with the conclusion that no notice was required.

Construing the clause most favorably to the plaintiff, it could be held to give to the Mortgage Company, or to any person, in fact, the right to advance money to pay the coupons at maturity and afterward treat them as if purchased from the owner. On such a construction the Mortgage Company, on paying the coupons at maturity, although apparently acting in the capacity of agent for the mortgagor, would have the option either to permit the payment to stand as such, or to hold the coupons as purchased and outstanding. But we think that if the person making such a payment desires to exercise the option to treat the transaction as a purchase, he should manifest his intention to do so by some sort of notice to the coupon holder, and he should disclose such intention at the time. He cannot continue to hold an option awaiting a possible more favorable turn of events. The coupon holder is entitled to know whether he has made a sale or received a payment. He is entitled to such notice so that he may protect his rights. He must know whether to account in his income tax return for the payment of interest, which he would be obliged to do if the coupons were paid, or otherwise if he had simply sold unpaid coupons. Also he has a right to know whether there was a default in the mortgage or simply a partial payment. Concealment of a default may deprive him of the opportunity to take necessary measures to protect his investment, if he has other bonds of the same issue.

To hold that the clause in the indenture by implication obviates the necessity of notice, when, as here, the coupon holder is unaware and not put on inquiry as to the intention of the Mortgage Company to exercise its option to purchase, is to sanction a facility for concealing the fact that the investment was becoming unsound and also assisting in a possible scheme to impose on the public by the sale of unsound bonds.

If it had been the intention, by any clause in the indenture, to permit the payer of coupons to treat them as purchased, at his option without notice, it would have been a simple matter to say so, as was done in the indenture discussed in Chicago Title & Trust Co. v. Hoffberg, 293 Ill.App. 290, 12 N.E.2d 230. In the absence of language dispensing with notice, a construction is justified and called for which lends protection to purchasers of securities and tends to reduce the opportunities for sharp practice and deceit in such transactions where knowledge of pertinent facts is withheld from the public.

We conclude that the plaintiff should not be held to be in the position of a purchaser of the coupons for the purposes of the plan of reorganization of Pelham Hall, Inc.

The district judge has found that the facts relating to the bonds and the coupons are the same, "except whatever effect may be given to the re-sale authority or orders issued at the time of payment" above referred to.

In other words, no bondholder presenting his bonds for payment was advised that the makers of the bonds had failed to pay the monthly installments called for by the trust mortgage and that the bonds were being paid from funds provided by the Mortgage Company and not by the mortgagor. They had no notice that the Mortgage Company intended to treat the transaction as a purchase, unless the issuing of the re-sale orders constituted such a notice. We do not understand that the district judge has found that any notice was given other than such as may be attributed to the re-sale orders or implied from the clause in the mortgage indenture above referred to.

As we hold that the clause in the mortgage neither gives notice nor waives the necessity for it, the effect of the re-sale orders should be considered.

We infer from the unequivocal findings of the district judge, to the effect that the intent of the Mortgage Company to exercise its right of purchase of the bonds and coupons "was never communicated to, or shared by, the bondholder presenting his bonds and coupons for payment", that the bondholder never had actual notice or knowledge of any proposed purchase by the Mortgage Company. The district judge held that the presentation and use made of the re-sale orders answered any requirement of notice. He said, "These orders were notice to the customers of this intention". (Intention by the Mortgage Company to exercise its option to purchase.) Evidently the district judge considered that the re-sale orders constituted constructive notice, putting the customer on inquiry. Under the circumstances of the case, considering the connection of the Mortgage Company with the ownership of the property mortgaged, and the purpose of the requirement of notice to the bondholder,—that he should have information of any such change in the apparent nature of the transaction, at the time the bonds were presented, in order to have an opportunity to protect his rights—we think such constructive notice not sufficient. But as constructive notice, the re-sale orders can hardly have the effect claimed for them. The re-sale blanks were not used until after the bonds had been presented for payment, while—as is admitted by counsel for the plaintiff,—the character of the transaction became irrevocably fixed when the bonds were presented, and, in any event, the request of the Mortgage Company that the customer sign such a re-sale authority is hardly a notice by the Mortgage Company of its intention to exercise an option to purchase on its own account.

The re-sale blanks, somewhat vague and technical in their terms, were largely handled in inter-bank transactions, and the district judge found that while some had been signed by customers and copies retained by the Mortgage Company, "so many of them had been lost or destroyed that it was not possible to determine how many were signed by the actual owner of the bond".

Under the circumstances disclosed, where one producing bonds, which had been apparently paid, desires to have them treated as outstanding as against other unpaid bonds of the same issue, in a reorganization, we consider that the burden is upon one producing the bonds to show the particular ones which he claims were affected by a transaction which changed their apparent status. Obviously there was no such proof.

We conclude that the bonds and coupons of Pelham Hall, Inc., which were presented for payment at maturity and paid from money advanced by the American Bond & Mortgage Co., should not have been permitted to be used in the reorganization proceeding on a parity with other bonds and coupons of the same issue which had not been so paid; and to that extent the decree of the District Court is reversed. This does not apply to any bonds or coupons taken up before maturity by the American Bond & Mortgage Company.

Our ruling in the Myles Standish case is the same. From the record we gather that the bonds and coupons which were paid by the American Bond & Mortgage Company at maturity out of its funds, without notice of an intention to exercise its option to purchase, were the bonds with maturities of June 1, 1927, December 1, 1927, and June 1, 1928; and the coupons due June 1, 1927, December 1, 1927, June 1, 1928, and December 1, 1928. These bonds and coupons only are covered by our ruling and should not be allowed to participate in the reorganization on a parity

with the other bonds and coupons of the same issue.

In each case:

The decree of the District Court is reversed and the case is remanded to that court for further proceedings not inconsistent with this opinion, with costs to the appellants.